[Crim. No. 6338. Third Dist. Apr. 27, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD ALBERT LAWRENCE, Defendant and Appellant.

## Counsel

Marsha B. Shanle, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Eddie T. Keller and Carol Hunter, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

JANES, J.—Defendant appeals from the judgment on jury verdicts convicting him of selling, furnishing, and giving away a restricted dangerous drug, amphetamine (count 1), and possessing a restricted dangerous drug, amphetamine, for sale (count 2). (Health & Saf. Code, §§ 11911, 11912.)

### Facts

Early in the evening of December 29, 1970, state narcotic agent Joseph Lindsay and a reliable informant, Jerry Ramirez, drove together to an apartment rented by defendant in the City of Sacramento. Lindsay had previously used Ramirez as an undercover buyer, and they planned that Ramirez would attempt to purchase drugs from defendant that evening.

Before proceeding to the apartment with Lindsay, Ramirez had been subjected to a "skin search" at Lindsay's office to make sure that he was not carrying contraband. Ramirez was given $500 in recorded state funds, and a radio transmitter was concealed by Lindsay on the informer's person.

At approximately 6:25 p.m., Ramirez entered the apartment. Lindsay waited in an adjacent washroom; four other agents and officers were in the area. None of them had a search warrant.

Although static interfered with reception over a radio receiver he was carrying, Lindsay heard on it parts of a conversation between Ramirez and another man, whose voice Lindsay could not identify. At trial, for the limited purpose of showing probable cause, Lindsay was allowed to testify that he initially heard over the radio a conversation inside the apartment "having to do with reds"—a street term used for seconal, a barbiturate. Then he heard Ramirez say that "an individual . . . had given Ramirez $500," and shortly thereafter he heard Ramirez say, "Okay,

here is the $500." From what he heard, Lindsay testified, he formed an opinion "as to whether or not a sale had been made . . . ."

Ramirez remained in the apartment about five minutes. When the door to the apartment opened, Lindsay saw the informer standing just inside the threshold. Lindsay approached him and observed protruding out of the informer's coat pocket the ends of several plastic bags which Lindsay could see contained miniature white amphetamine tablets. The door was still open. Lindsay did not knock, but in a loud voice announced "Police officers" several times and then entered the apartment. Another officer stayed behind and frisked Ramirez at the doorway, finding in the informer's pockets 10 plastic bags each containing 1,000 amphetamine tablets.

Lindsay proceeded from the doorway 20 feet to the kitchen. There he saw defendant sitting eating dinner at the kitchen table, accompanied by a woman named Adeline Ciannella, whom the evidence showed to be a co-lessee of the apartment. The $500 which had been given to Ramirez was on the table an inch or two from defendant's plate and directly in front of where he was sitting.

Lindsay observed three small plastic bags on the kitchen table. On the kitchen drainboard, an arm's length from where defendant was sitting, there was an open brown paper bag inside of which eight more plastic bags were visible. Seven additional small plastic bags were found in a kitchen cabinet drawer after defendant was arrested at the apartment.

Like the 10 bags found on the informer's person, all of the plastic bags found in the kitchen contained miniature white, cross-marked, amphetamine tablets commonly known as "double-scored mini-Bennies." Each of the larger plastic bags contained 10 smaller bags, in each of which were 100 tablets. In Lindsay's opinion as an experienced investigator, this method of packaging indicated that the tablets were packaged not only for sale but also for resale in smaller quantities. Approximately 19,000 amphetamine tablets were confiscated at the apartment.

The informer, Ramirez, testified[1] that he had been in contact with defendant during the month preceding the arrest; that defendant had rented the apartment to store "narcotics" there; that defendant had brought the amphetamine tablets into the apartment; and that, on the night before the arrest, he (Ramirez) had helped defendant and Adeline

[1]Although subpoenaed by the prosecution (and apparently by defendant also), Ramirez did not appear during presentation of the People's case. A bench warrant was issued for his apprehension, and upon his appearance he was called by defendant, who was permitted to examine the informer as a hostile witness. As shown in the text which follows, Ramirez gave testimony generally unfavorable to defendant.

Ciannella package the tablets there. Ramirez further testified that, when he entered the apartment kitchen on December 29, he told defendant that a customer wanted 10,000 tablets at $60 per thousand; that the customer had given him $500; and that he (Ramirez) was going to take the tablets and receive the $100 balance upon delivery. According to Ramirez, defendant replied that "it was okay" and said, "We're finally getting going . . . ." Ramirez then got the brown paper bag out of the kitchen drawer, took out 10 plastic bags of tablets and placed them in his coat pocket, put the $500 on the table, and left the paper bag on top of the sink.

## DEFENSE

Adeline Ciannella—who was the only other person in the apartment with defendant and Ramirez at the time of the alleged sale—testified that Ramirez had a key to the apartment (a fact which Ramirez and agent Lindsay admitted); that Ramirez had been there with her on December 28; that, while she and defendant were having supper on December 29, Ramirez came into the kitchen, placed "[s]ome money" on the table, and asked their permission to leave the money there so that it would not be stolen while he was walking the streets; that they gave their consent; and that, before he left, Ramirez put "something" in his pocket after taking it out of a bag which was in the cupboard by the drainboard.

Defendant took the stand and denied knowing that the amphetamines were in the apartment prior to his arrest. He testified that Ramirez was a trafficker in narcotics and drugs;[2] that, on December 26 at the home of Ramirez's mother, he saw Ramirez and Adeline Ciannella counting "a large amount of amphetamines" and packaging them in the same plastic bags which were seized at the apartment on December 29; that, when Ramirez had finished counting the amphetamines, the informer put the plastic bags into a brown paper bag; and that Ramirez had moved into the apartment on December 28. Like Ciannella, defendant claimed that on December 29 Ramirez told them he did not want to carry the $500 with him outside the apartment; that Ramirez left the money on the kitchen table after obtaining defendant's permission to do so; and that, before he left, Ramirez "spent some time at the cupboard."

## EVIDENCE OF OAKLAND CRIMES

During the prosecution's case-in-chief, evidence was introduced that in Oakland on July 18, 1970, defendant had attempted to sell to an under-

---

[2]Ramirez testified that in November 1970 he pleaded guilty in Yolo County to possession of LSD for sale.

cover agent marijuana and, at $65 per bag, two plastic bags of white, double-scored mini-Bennies. Such evidence showed that the two bags each contained 1,000 amphetamine tablets, and that defendant carried the plastic bags in a brown paper bag. There was also evidence that, in Oakland on the same July date, a search of defendant's truck turned up a large quantity of marijuana and six other plastic bags each containing 1,000 double-scored mini-Bennies, that those six bags were also stored in a brown paper bag, and that a small plastic bag containing 100 such tablets was found in defendant's coat in the truck. Defendant was arrested in Oakland at the time, but had not been convicted of the Oakland charges when he came to trial on the matters at bench.

The court properly instructed the jury as to the limited purposes for which the jury could consider evidence of a crime committed by defendant other than the one for which he was on trial. (CALJIC (3d ed.) No. 2.50.)

Insofar as it related to amphetamines, the Oakland evidence was offered by the prosecutor "to show the defendant's knowledge, his modus operandi, his intent, and also for the purpose of showing the absence of any mistake or accident on his part in entering into the transaction now before the Court." Defendant's objection to the offer of proof was overruled. Although the prosecutor's offer mentioned only "amphetamines," and not marijuana, defendant's attorney did not move to strike the later testimony concerning marijuana; indeed, defense counsel stipulated that the marijuana seized in Oakland totaled 2.3 kilograms. Similarly, on this appeal, defendant does not complain that the prosecutor's offer of proof was of narrower scope than the evidence actually introduced.

Defendant's brief acknowledges that "Evidence of prior sales has been allowed to show modus operandi [citations], to show knowledge of the narcotic nature of the substance [citations], and to show general criminal intent [citations]." (See *People* v. *Hernandez* (1971) 19 Cal.App.3d 411, 418-419 [96 Cal.Rptr. 854]; Evid. Code, § 1101, subd. (b).) ▆ He contends, however, that the evidence was inadequate to show modus operandi, and that it was improper for the alleged Oakland events to be introduced during the People's case-in-chief inasmuch as his plea of not guilty did not by itself raise "genuinely controverted" issues as to knowledge and intent.

The contentions fail. ▆ "*Modus operandi* is generally a means of proving the identity of the perpetrator of the crime charged, by demonstrating that the defendant had committed in the past other crimes sharing with the present offense features sufficiently unique to make it likely that the same person committed the several crimes. [Citations.] That likelihood

must then outweigh the prejudicial effect of the evidence." (*People* v. *Sam* (1969) 71 Cal.2d 194, 204 [77 Cal.Rptr. 804, 454 P.2d 700].) "[W]hen such evidence is introduced for the purpose of proving the identity of the perpetrator of the charged offense, it has probative value only to the extent that *distinctive* 'common marks' give logical force to the inference of identity. If the inference is weak, the probative value is likewise weak, and the court's discretion should be exercised in favor of exclusion." (*People* v. *Haston* (1968) 69 Cal.2d 233, 247 [70 Cal.Rptr. 419, 444 P.2d 91].) (Original italics.)

Here, "considered in combination" (*People* v. *Haston, supra,* 69 Cal.2d at p. 249), the "common marks" of the Oakland crimes were sufficiently similar to those at bench to justify their admission into evidence, even though, as Lindsay testified, it is common in the illicit drug trade for amphetamines to be sold in quantities either of 1,000 or 100 tablets. In each instance, defendant was shown to be involved with white, double-scored mini-Bennies; the price was approximately the same per thousand ($65 in Oakland, $60 in Sacramento); the tablets were packaged in plastic bags; and the plastic bags were carried or stored in brown paper bags.

*People* v. *Gregg* (1968) 266 Cal.App.2d 389 [71 Cal.Rptr. 920], *People* v. *Todd* (1969) 1 Cal.App.3d 547 [81 Cal.Rptr. 866], and *People* v. *Anderson* (1970) 6 Cal.App.3d 364 [85 Cal.Rptr. 669], all of which are relied upon by defendant, support his argument that his knowledge and intent regarding the Sacramento crimes were not "genuinely controverted" by his plea of not guilty, and that the Oakland evidence should have been excluded from the prosecution's case-in-chief. The *Gregg, Todd,* and *Anderson* cases, however, can no longer be considered authoritative in that respect in view of the holding in *People* v. *Archerd* (1970) 3 Cal.3d 615 [91 Cal.Rptr. 397, 477 P.2d 421]. In *Archerd,* where the defendant was tried for multiple murder, it was held proper to receive evidence of three uncharged murders. The court said, "There is no merit in the contention of defendant that until he puts in issue either identity, intent or other fact the People may not anticipate this and present evidence of other acts in their case in chief. It is not necessary for the defendant to raise issues before the People may meet them where this is part of the prosecution's burden. The People have the burden of establishing intent and identity." (*Id.* at p. 639.) (See also *People* v. *Hernandez, supra,* 19 Cal.App.3d at pp. 418-419; *People* v. *Perry* (1969) 271 Cal. App.2d 84, 101-102 [76 Cal.Rptr. 725].)

## JUDGMENT OF ACQUITTAL
## NOT ORDERED

■ Defendant contends that the court, *sua sponte*, should have ordered judgment of acquittal on both counts at the close of the People's case.[3] The contention is without merit.

Penal Code section 1118.1 provides that "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal . . . ."

■ The test to be applied by the trial court under section 1118.1 is "the same test applied by an appellate court in reviewing a conviction: whether from the evidence, including reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged [citations]." (*People* v. *Valerio* (1970) 13 Cal. App.3d 912, 919 [92 Cal.Rptr. 82].)

■ Disregarding the testimony of Ramirez, who incriminated defendant when called by him, there was (as summarized above) substantial evidence presented during the People's case that defendant had actual or constructive possession of a usable quantity of amphetamine at the apartment; that he had knowledge of its presence; that he had knowledge of the nature of the tablets; that he possessed the drug for purposes of sale; and that he engaged in a sale through Ramirez (or at least furnished the tablets to the informer). (See *People* v. *Hunt* (1971) 4 Cal.3d 231, 236 [93 Cal.Rptr. 197, 481 P.2d 205]; *People* v. *Carnesi* (1971) 16 Cal. App.3d 863, 871-872 [94 Cal.Rptr. 555]; *People* v. *Valerio, supra,* 13 Cal.App.3d at p. 921; *People* v. *Allen* (1967) 254 Cal.App.2d 597, 602 [62 Cal.Rptr. 235].)

## COMPETENCY OF TRIAL COUNSEL

■ Defendant contends that his trial attorney was incompetent because the attorney did not invoke Penal Code section 844 and move to suppress or object at trial to the admission of evidence of the contraband seized in the apartment. (See Pen. Code, § 1538.5, subd. (h).) We reject the contention.

---

[3]At trial, defendant moved for entry of a judgment of acquittal after both sides had completed presentation of evidence. On appeal, it is not contended that the evidence at that stage compelled the granting of defendant's motion.

In relevant part, section 844 provides: "To make an arrest, . . . a peace-officer . . . may break open the door . . . of the house in which the person to be arrested is, or in which [the officer has] reasonable grounds for believing him to be, after having *demanded admittance* and *explained the purpose for which admittance is desired."* (Italics added.) In the case at bench, Lindsay's entry through the open door of the apartment was a "breaking" within the meaning of the statute, especially since the door was opened by Ramirez acting as a law enforcement agent. (See *People* v. *Leighter* (1971) 15 Cal.App.3d 389, 397 [93 Cal.Rptr. 136]; *People* v. *Anderson* (1970) 9 Cal.App.3d 80, 85 [88 Cal.Rptr. 4]; *People* v. *Arias* (1970) 6 Cal.App.3d 87, 93-94 [85 Cal.Rptr. 479]; *People* v. *Norton* (1970) 5 Cal.App.3d 955, 960-963 [86 Cal.Rptr. 40]; cf. *People* v. *Garnett* (1970) 6 Cal.App.3d 280, 289-290 [85 Cal.Rptr. 769].)

After seeing Ramirez coming out the open doorway with contraband in his pocket, as heretofore stated, Lindsay did not knock but in a loud voice announced "Police officers" several times and then entered the apartment. Thus, what is lacking in this case is a literal compliance by Lindsay with the requirements of section 844 that he have first (1) "demanded admittance" and (2) "explained the purpose for which admittance [was] desired." In our view, however, Lindsay substantially complied with section 844 under the particular circumstances shown.

In *People* v. *Hall* (1971) 3 Cal.3d 992, at page 997 [92 Cal.Rptr. 304, 479 P.2d 664], the court observed that an arresting officer "gave notice of his *demand for entrance* through knocking [i.e., pounding on the door (p. 995)] and he identified himself as a police officer." (Italics added.) (Compare *People* v. *Superior Court* (1969) 274 Cal.App.2d 578, 581 [79 Cal.Rptr. 55]; *People* v. *Olivas* (1968) 266 Cal.App.2d 380 [72 Cal. Rptr. 109].) Here, Lindsay did not knock, but, as said in *People* v. *Norton, supra,* 5 Cal.App.3d at page 962, "A knock at the door or a ringing of a doorbell is nothing more than a means of requesting recognition of presence." (To the same effect, see *Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 319 [82 Cal.Rptr. 348, 461 P.2d 628]; *Greven* v. *Superior Court* (1969) 71 Cal.2d 287, 291 [78 Cal.Rptr. 504, 455 P.2d 432].)

Lindsay stated his authority when he announced "Police officers" (*Greven* v. *Superior Court, supra,* 71 Cal.2d at p. 292 & fn. 6); and, in making that announcement *several times in a loud voice,* his statement, under any reasonable interpretation, was plainly intended to communicate and was a reasonable effort to communicate his official status to the occupants and thereby to request recognition of his presence. There was thus the equivalent of a *demand for admittance.* (Compare *People* v. *Benjamin* (1969) 71 Cal.2d 296, 297-298 [78 Cal.Rptr. 510, 455 P.2d 438].)

Furthermore, Lindsay was excused from complying with the statutory requirement that he explain, before entry, the *purpose* for which he desired admittance. In *People* v. *Rosales* (1968) 68 Cal.2d 299, at page 302 [66 Cal.Rptr. 1, 437 P.2d 489], the court indicated that the arresting officers' disclosure of their official identity "could constitute substantial compliance with section 844 . . . if the surrounding circumstances made the officers' purpose clear to the occupants . . . ." Here, as said in *People* v. *Hall, supra,* "Where a criminal offense has just taken place within a room, the occupants may reasonably be expected to know the purpose of the police visit and an express statement of purpose may not be necessary. [Citations.]" (3 Cal.3d at p. 997.) " 'Contemporaneous commission of a felony certainly qualifies as a surrounding circumstance which would make the officers' purpose clear to the occupants of the premises and excuse the police from the need to explain why they desired admittance . . . .' [Citation.]" (*People* v. *Sotelo* (1971) 18 Cal.App.3d 9, 18-19 [95 Cal.Rptr. 486].)

The officers' purpose need only be "reasonably apparent" to the occupants, and their contemporaneous commission of an offense charges the occupants with that degree of perception. (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 666 [47 Cal.Rptr. 788, 408 P.2d 116]; *People* v. *Martin* (1955) 45 Cal.2d 755, 763 [290 P.2d 855].)[4]

Under the foregoing authorities, Lindsay complied with the minimum requirement of section 844 that there be a reasonable "effort by the officers prior to entry to communicate to persons inside that they seek to be admitted in order to discharge their duties *as law enforcement officers*" (*Greven* v. *Superior Court, supra,* 71 Cal.2d at p. 293 (original italics) (fn. omitted)). Lindsay's loud and repeated identification of himself was adequate to safeguard the purpose of section 844 "to protect the fundamental right of privacy of dwelling occupants and to insure the safety of the police, innocent bystanders, and occupants, who may be injured as a consequence of violent resistance to unannounced entries" (*People* v. *Arias, supra,* 6 Cal.App.3d at p. 93).

There is no basis, therefore, upon which it can be held that Lindsay's entry was so clearly invalid that defense counsel's failure to invoke section 844 reduced the trial to a farce or a sham. (See, *People* v. *Knifong** (Cal.

---

[4]Although bound by the cases cited, we observe that the "reasonably apparent purpose" exception to section 844 calls for circuitous reasoning. Application of the exception assumes the "contemporaneous commission" of an offense by the defendant; from that assumption, the exception reasons that the defendant knew the purpose of the police entry; from the latter conclusion, the exception validates the seizure of incriminating evidence; and on the basis of that evidence, the defendant is proved guilty—thus bringing us full circle back to the initial assumption.

*A hearing was granted on April 19, 1972.

App.) [100 Cal.Rptr. 92]; *People* v. *Johnson* (1970) 5 Cal.App.3d 851, 862-863 [85 Cal.Rptr. 485].)

The judgment is affirmed.

Richardson, P. J., and Friedman, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 22, 1972.