[No. D016240. Fourth Dist., Div. One. Jan. 26, 1993.]

In re KHAMPHOUY S., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
KHAMPHOUY S., Defendant and Appellant.

COUNSEL

Elizabeth A. Barranco, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Holly D. Wilkens and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TODD, J.—Khamphouy S. appeals a juvenile court order committing him to the juvenile ranch facility following true findings he unlawfully possessed live ammunition (Pen. Code,[1] § 12101, subd. (b)) and violated conditions of probation.

On June 12, 1991, the juvenile court placed Khamphouy on probation following a true finding he committed grand theft from a person (§ 487, subd. 2). On February 11, 1992, the court found he possessed live ammunition and violated probation conditions by having control of a loaded firearm and being out after curfew. The court found the previous disposition had

---

[1]All statutory references are to the Penal Code.

been ineffective. It continued the wardship and committed Khamphouy to the juvenile ranch facility for a maximum of 240 days.

At approximately 2:30 a.m. on December 22, 1991, California Highway Patrol Officer Timothy Little was with his partner Mike McCracken on Highway 5 south of downtown San Diego. Little pulled over a vehicle for speeding and weaving. Three people were in the front seat. Khamphouy was in the middle. Little approached the car. He noticed the odor of alcohol. The driver gave him the car's registration, but had no license. After a field sobriety test, Little arrested the driver for being under the influence and placed him in the back seat of the patrol car. While Little was speaking to the passenger sitting in the passenger seat nearest the door, McCracken noticed a gun on the car floor. McCracken yelled "gun" and Little ordered the right front passenger to lie on the ground, handcuffing him. While McCracken covered Khamphouy with a drawn weapon, Little ordered Khamphouy out of the car, put him on the ground and handcuffed him. Little found eight .38-caliber rounds in Khamphouy's right jacket pocket and five such rounds in his right front pants pocket. The 13 bullets from Khamphouy's jacket and pants were put into separate evidence bags. McCracken noted the eight .38-caliber rounds from Khamphouy's jacket pocket were CCI brand ammunition, a cheap quality ball-type round with an aluminum casing.

After Khamphouy and the other passenger were handcuffed, McCracken searched the car and recovered two handguns from the floor under the passenger's seat. He found a .357 magnum directly beneath where Khamphouy was sitting and a .38 revolver about in the middle of the seat below where Khamphouy's right thigh was when he was in the car. Each gun was loaded with six .38-caliber rounds.

To make the guns safe and storable, McCracken took the rounds out of the guns. McCracken noted the rounds in the .38 revolver were CCI brand rounds and the .357 magnum contained various other brands of .38 rounds. He placed the bullets from the guns in two separate evidence bags. In addition, McCracken found under the passenger seat a bag containing different varieties of different manufactured brands of .38 rounds, and he placed this in another evidence bag.

Khamphouy contends the record lacks sufficient evidence he possessed live ammunition and the trial court erred in committing him to the juvenile ranch facility.

DISCUSSION

I

Section 12101, subdivision (b) provides:

"A minor may not possess live ammunition unless he or she has the written consent of his or her parent or legal guardian or is accompanied by his or her parent or legal guardian, except while going to or from an organized lawful recreational or competitive shooting activity or lawful hunting activity."

Khamphouy argues the record lacks evidence the ammunition he possessed was live. ■ We may not reverse an order on the ground of insufficient evidence unless it clearly appears "that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [457 P.2d 321].) "Substantial" evidence is evidence of legal significance, reasonable in nature, credible and of solid value. (*People* v. *Samuel* (1981) 29 Cal.3d 489, 505 [174 Cal.Rptr. 684, 629 P.2d 485].) The court must review the whole record in the light most favorable to the order below and presume in support of the order the existence of every fact the trier could reasonably deduce from the evidence. (See *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781].)

■ It is axiomatic the prosecution bears the burden of proving each element of a criminal offense charged beyond a reasonable doubt. (*People* v. *Montalvo* (1971) 4 Cal.3d 328, 333 [93 Cal.Rptr. 581, 482 P.2d 205]; *People* v. *Vargas* (1973) 36 Cal.App.3d 499, 506 [111 Cal.Rptr. 745]; § 1096.) ■ Just as the prosecution must establish the chemical nature of restricted dangerous drugs discovered in the possession of a defendant under relevant controlled substances statutes (see, e.g., *People* v. *Torres* (1982) 133 Cal.App.3d 265, 279 [184 Cal.Rptr. 39]; *People* v. *Carnesi* (1971) 16 Cal.App.3d 863, 869-871 [94 Cal.Rptr. 555]), so must it prove the ammunition possessed by the minor is "live" to establish a violation of section 12101, subdivision (b). "Live ammunition" as contemplated by the Legislature under this statute consists of any material (i.e., projectiles, shells, or bullets) in the present state of being capable of being fired or detonated from a pistol, revolver or any firearm. (See § 12001, subds. (a) and (b); Random House Dict. (2d ed. 1987) p. 69; Amer. Heritage Dict. (2d college ed. 1976) p. 43.)

■ Here, at the jurisdictional hearing, defense counsel challenged the sufficiency of the evidence regarding whether the ammunition found on

Khamphouy was in fact live.[2] The court responded, however, it looked live.[3] The record contains evidence Khamphouy had thirteen .38-caliber rounds in his pockets. Under the seat on which he was sitting were two guns which McCracken describes as "loaded" with .38-caliber rounds. The brand of ammunition found in Khamphouy's jacket pocket was the same as the bullets in the .38 revolver. The rounds found in Khamphouy's pockets appeared live to the court which by clear implication rejected the notion that evidence of testing the ammunition was necessary. From the officers' actions in dealing with the situation as a matter of utmost gravity after a gun was first seen, including not only unloading the guns to make them "safe" but also carefully collecting, separating and describing the types of ammunition found, it is a reasonable inference based on solid evidence that the ammunition was live. Why else would the officers have so carefully dealt with the ammunition? There was substantial circumstantial evidence the ammunition in Khamphouy's pockets was live ammunition. The trial court did not err in entering a true finding Khamphouy possessed live ammunition.

## II

■ The court followed the probation department's recommendation and committed Khamphouy to the ranch. Khamphouy contends this was error.

"An order of disposition, made by the juvenile court, may be reversed by the appellate court only upon a showing of an abuse of discretion. . . ." (*In re Darryl T.* (1978) 81 Cal.App.3d 874, 877 [146 Cal.Rptr. 771].) It is not the responsibility of this court to determine what we believe would be the most appropriate placement for a minor. This is the duty of the trial court, whose determination we reverse only if it has acted beyond the scope of reason. (*People* v. *Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65].) The court reasonably determined that a camp commitment was appropriate for a 17-year-old with Khamphouy's escalating criminal conduct which violated the conditions of probation.

The juvenile court did not abuse its discretion in committing Khamphouy to the juvenile ranch facility.

---

[2]Khamphouy's counsel argued: "Finally as to count five. Your Honor, there was no testimony whatsoever that any of those rounds shown to this court were live. Not one was test fired. No one asked a question about whether the ammunition appeared to be new, old, or whether it had any load of gunpowder whatsoever. [¶] Again, insufficient evidence to support beyond a reasonable doubt."

[3]The court responded: "That's based upon circumstantial evidence that is before me in terms of the ammunition that was found on his person compared with the ammunition found on [*sic*] the weapon, compared to the extra ammunition found in the gun. [¶] And I think I can use common sense in looking at the ammunition. It looks live to me. I wouldn't put it in a gun and shoot it."

Order affirmed.

Benke, J., concurred.

**WORK, Acting P. J.**—I respectfully dissent. Although the majority recognizes the prosecution must establish beyond reasonable doubt the ammunition taken from Khamphouy's pockets was "live," i.e. that it was presently capable of being detonated from a firearm, it accepts that element as being established in a case where the People made no attempt to present evidence on that point, and none exists. Instead, the majority makes assumptions which this record does not support. The majority's conclusion founders on the shoals of the proposition stated in *Marshall* v. *Parkes* (1960) 181 Cal.App.2d 650, 655 [5 Cal.Rptr. 657]:

"To support a finding, 'the inference or inferences indulged in must be reasonable, must be based on the evidence, cannot be the result of mere guess, surmise or conjecture' [citations], or 'be based on imagination, speculation or supposition.' "

The majority relies on evidence that Khamphouy had .38-caliber cartridges in his pockets which were similar to others found in a .38 revolver which was retrieved beneath the car seat on which he was sitting. Officer McCracken described this gun as being "loaded" and stated he removed these cartridges and then described the gun as "safe." In addition, the majority describes his actions as *"carefully"* collecting, separating and describing the types of ammunition found and distills from its characterization that there is a "reasonable inference based on solid evidence that the ammunition [taken from Khamphouy's pockets] was live." The majority queries "why else would the officers have so *carefully* dealt with the ammunition?"[1]

In response to the majority's inquiry, at best, the officer's comments regarding making the gun "safe" could infer he assumed the weapon may have contained "live" ammunition. However, that inference cannot support the additional inference accepted by the majority, that the officer's unstated belief, if he in fact held it, is correct beyond reasonable doubt. The officer was neither asked nor testified this was in fact his belief, did not identify any factual basis to support such an inferred opinion, nor did the People attempt to establish he held such an opinion. However, as the majority assuredly would agree, an officer who seizes milk sugar from a purchaser after

---

[1]Although it alludes to the trial court's observation that the ammunition looked live to it, the majority does not purport to give evidentiary weight to the trial court's implied claim of expertise.

observing a suspected drug sale is likely to assume the material is a controlled substance, especially if the purchaser attempts to evade arrest because of the same mistaken belief. However, in that hypothetical scenario, the officer's assumption, reasonable though it may be, would not satisfy the requirement that the narcotic nature of the material seized be established chemically, and the purchaser's evasive actions would not be evidence to satisfy that element.

Even more strained is the majority's emphasis on the officer's "carefully" collecting, separating and describing the types of ammunition found. The officer never stated he acted "carefully," and the record at best only shows he performed these routine tasks so that the cartridges retrieved from various locations in separate baggies would be separated in individual lots to permit later identification showing where each group was found. For instance, bullets taken from the .357 magnum and the .38-caliber revolver were separated between exhibits 4 and 5, rounds located under the right front passenger seat of the car were placed in exhibit 8, loose rounds taken from Khamphouy's pants pocket were placed in exhibit 6 and those from his jacket pocket in exhibit 7. The majority's gratuitous characterization of this routine evidentiary chore as being "carefully" undertaken is pure speculation. Even if this characterization were accurate, it still fails to have any tendency to prove the officer performed these evidence preservation functions in a particular manner because he believed the ammunition in Khamphouy's pockets was "live."

Although it would have been a simple task to test fire one round or to visually examine at least one cartridge by removing the lead bullet from its casing to determine if it contained an explosive mixture, this was not done. The officers did not testify as to any expertise in distinguishing, through exterior examination, "live" ammunition from bullets which are not, did not proffer an opinion on that subject, and identified no features from which the court could judicially notice this ammunition was "live" through visual inspection. In sum, although the majority purports to recognize the prosecution has the burden establishing this element, it accepts it as proved without any evidence being presented on this point, inferring it from the fact Officer McCracken stated his removal of different cartridges of the same brand from a revolver made the gun "safe" and its imaginative characterization of the manner in which the evidence was catalogued.

Having stated the above, I am not unaware of the high probability that simple testing would show some, if not all, the ammunition taken from Khamphouy's pockets contained an explosive propellant. It gives me no sense of satisfaction to contemplate that, because of the People's failure to

anticipate its burden of proof or to ask to reopen its case once the failure to establish the element was raised once it rested its case, this minor might avoid the true finding on this count, even though it adds only four months to the maximum term of his juvenile confinement. Certainly, a visual examination of the *contents* of a cartridge could have occurred in the courtroom within a matter of minutes and its results likely would have provided evidentiary basis to support the requisite finding. However, even this minimal effort was not attempted when the issue was presented by defense counsel. As the authorities cited by the majority reflect, each element of this offense must be established beyond reasonable doubt *by evidence*, a burden not carried by the People in this case.