[Crim. No. 16797. Second Dist., Div. Five. Mar. 27, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
GUS SAMUEL ARIAS, Defendant and Appellant.

---

**COUNSEL**

G. G. Baumen for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

---

**OPINION**

**AISO, J.**—Defendant and codefendant Joseph Edward Gonzales were charged by information with having committed burglary at John Marshall

High School (count I) (Pen. Code, § 459), and receiving stolen property (count II) (Pen. Code, § 496). Motions were made under sections 995 and 1538.5 of the Penal Code to set aside the information and to suppress evidence. The 995 motion was granted as to count I, but denied as to count II. Defendant and codefendant pleaded "not guilty" and then submitted the 1538.5 motion on the preliminary hearing transcript and three exhibits offered in evidence. The court denied this 1538.5 motion.

Defendant and codefendant duly waived their right to a jury trial. It was stipulated that the issue of guilt be submitted on the testimony and exhibits presented at the preliminary hearing, subject to the court's rulings, and with both the prosecution and defense reserving the right to offer additional evidence. At trial, the testimony of defendant and a Mrs. Mickey Curtis[1] and two exhibits offered by defendant were received into evidence. The court found defendant "guilty" on count II. Sentence to one year in the county jail was imposed but suspended; probation was granted on condition, inter alia, that defendant spend the first 120 days in the county jail and pay a fine of $200 plus penalty assessment. While the notice of appeal is ambiguous in stating that defendant appeals from the final judgment of conviction "being the Order Granting Probation," we construe the appeal to encompass both the judgment and order granting probation.

▮▮▮ Defendant contends: (1) there was no probable cause for arrest; (2) the evidence is insufficient to support a conviction for receipt of stolen property; (3) the arrest and search and seizure were unlawful because the police failed to comply with the provision of Penal Code section 844.[2] We have concluded that the third assignment of error has merit compelling a reversal of the judgment and that it is therefore unnecessary to discuss the other two contentions.

Viewing the evidence in the light most favorable to the respondent People, as required on appellate review (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]; *People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049], the facts are as follows:

Elijah Robinson, the custodian of John Marshall High School in Los

---

[1]Although the witness' name appears as Mrs. Mickey Curtis in the reporter's transcript and Miki Curtis in the clerk's transcript, the same individual is intended.

[2]Penal Code section 844: "To make an arrest, a private person, if the offense be a felony, and in all cases a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

Angeles, was the last person to leave the school building on Sunday, September 15, 1968.[3] To his knowledge no one had permission to enter the building after he had locked it at 5 p.m. that day. When he returned to the building at about 6:20 the following morning, September 16, 1968, he noticed that a window had been broken and that the door to room 208 was open. From the open doorway of the room, Robinson further discovered that the business machines which he had previously helped place on tables in the room were missing.

Defendant was a 19-year-old student in his second year at Los Angeles City College. He attended school daily from approximately 9 a.m. until 3 p.m. and held a full-time job at All-Mailing Service from 4:30 p.m. to 12:30, 1 or 2 a.m. Defendant lived in a two-bedroom apartment, which he shared with fellow students, codefendant Joseph Edward Gonzales and Gary Widman, at 4411 Lockwood Street, Los Angeles, California. The apartment, #307, was on the third floor of the building and could be approached on the outside via a walkway or deck. From this walkway-balcony one could enter the apartment living room through an entrance door on the left or enter the front bedroom through the bedroom sliding glass door (full-length window) to the right. Defendant and Gonzales occupied this front bedroom, sleeping in individual beds on the right side of the room, while Widman used the back bedroom. Since all three roommates were under 21 years, Gonzales had asked Tom Sunseri, an adult, to add his signature to those of the minors on the apartment lease. In exchange for Sunseri signing the lease, it was agreed that he could "keep some of his stuff in the apartment from time to time." Sunseri lived somewhere in Westwood and never lived at defendant's apartment. He was characterized at various times as Gonzales' friend, uncle, and co-worker at Kentucky Fried Chicken. Defendant had met Sunseri on only one occasion, and had not talked to him nor made any effort to find him since the arrest.

Defendant worked the evening of Thursday, September 26, 1968, then came home and went to bed at about 1 a.m. During the night, around 2 a.m., he was awakened by a tapping on the bedroom window. In response to the tapping, Gonzales got out of bed and went to the window. A tall thin boy entered the apartment and spoke with Gonzales. In this conversation defendant heard mention of "something about Tom, they were Tom's." The boy walked outside, where there was someone else, and then came back into the apartment rolling a shopping cart containing approximately 10 to 15 adding machines. He took the machines out of the cart and placed them against the left wall, which separated the bedroom

---

[3]We judicially notice that September 15, 1968, fell on a Sunday.

from the living room, and underneath the coffee table situated in front of the beds. Defendant had never before seen the boy who came into the apartment or the individual who remained outside that night, and has never questioned or spoken to either of them. Defendant got up from his bed, looked at the machines, and noticed that they had tags indicating "L.A. City Schools." Upon defendant inquiring about the machines, Gonzales stated, "Don't worry about it; it's Tom's [Tom Sunseri's]." Defendant had been given to understand that Sunseri "worked for different companies, and cleaning machines and different things." Defendant then went back to bed without handling, moving or touching the machines.

The following morning, Friday, September 27, 1968, defendant arose and went to school and work in accordance with his usual daily schedule. When he returned to his apartment at 1 a.m. he noticed that the machines were still present. Gonzales told defendant that he had spoken with Sunseri at work earlier in the night, and that Sunseri stated that he had a buyer for the machines and would come to the apartment the following Tuesday to pick them up. From this information defendant and Gonzales concluded that the machines were stolen property. At this point defendant wanted to call the police but did not do so for fear of getting in trouble. Defendant then thought about calling his father or a lawyer; however, since it was then about 3 a.m. he decided to wait until morning.

Sometime around 9:30 in the morning (Saturday, September 28, 1968) when defendant got up to go to the bathroom, he heard the landlady, Mrs. Curtis, talking with Gonzales. Mrs. Curtis had called into the apartment: "Are you boys sleeping? . . . I had a complaint that you kids play your music late at night, so will you knock it off." Mrs. Curtis testified that at the time of this incident the sliding bedroom door was a "little bit open" but the curtains on the door were closed and she could not see into the apartment. Defendant immediately went back to bed and fell asleep lying on his stomach.

William J. Delong, a police officer for the City of Los Angeles assigned to Rampart Division Patrol, arrived at the address of 4411 Lockwood, apartment 307, at approximately 11:15 that Saturday morning, in response to a radio call informing him "459 [burglary] suspects there now, see the manager in Apartment 102." Two other officers, Acosta and Tyler, arrived on the scene shortly thereafter. Officer Delong went up to the front door of apartment 307 which faced on the outdoor balcony and noticed that 2 feet to the right of the front door there was a large sliding glass bedroom door that was open. The opening was wide enough for a person to walk into the bedroom and was not covered by a screen or drapes, which were

partially open.[4] Through the open door and curtains Delong was able to observe about two adding machines, with Los Angeles City Schools stickers on their sides, against the left bedroom wall and approximately 2 to 3 feet from where he was standing. At that time Officer Delong believed the machines to be stolen and that if there were any people inside the apartment they were in possession of stolen property. He did not, however, have an arrest or search warrant. From his position at the bedroom door entrance he did not see anyone sleeping in the room. When Officer Delong entered the apartment through the large sliding glass door he saw defendant and Gonzales sleeping in separate beds on the right side of the room approximatel 5 to 7 feet distant from where the machines were. Lying beside the beds were two large butcher knives. The officer removed the knives to another part of the room and awoke defendant and Gonzales. Delong asked them if they had called the police and both replied "no." When asked whether they resided in the apartment, they both stated "yes."

Officer Acosta then entered the room and was advised of the situation by Delong. Acosta informed defendant and Gonzales of their constitutional rights and each replied "yes" when queried whether they wished to waive their rights.[5] Acosta then asked defendant and Gonzales where they had obtained the adding machines. Both stated that Thomas Sincereni (sic) asked them to keep the machines for him. Upon being asked whether the machines were stolen, defendant replied: "Yes, when I saw Los Angeles City Schools on the side of the machines, I knew the machines were stolen."

Officer Delong found approximately 15 adding machines and calculators at the apartment, all bearing the identification of the Los Angeles City Schools. He recorded the serial numbers of the machines and took the property into custody. Also found in the apartment were a Remington shotgun, a .22 caliber rifle, and a 12-gauge shotgun, identified by defendant as the property of Gonzales.

At the preliminary hearing all parties stipulated that it be deemed that Mr. Walter Marshall, an employee of the Board of Education of the City of Los Angeles, was called and testified that he has access to the books and records of the board of education and that according to those records the approximately 15 machines recovered by Officer Delong were the

---

[4]Defendant testified that the curtains and screen door were closed on the morning in question. Mrs. Curtis agreed that the curtains were closed but apparently found the screen door to be open. Later she stated she did not notice whether "the screen" was open or closed.

[5]The adequacy of the warnings and waivers under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] is not an issue on this appeal.

property of John Marshall High School and the Board of Education of the City of Los Angeles.

When Officer Delong entered the apartment through the open bedroom door he had neither knocked nor employed any other means reasonably calculated to notify the apartment occupants of his presence or of his authority and purpose of desiring admittance. The question presented on this appeal is whether such an unannounced entry through an open door in the daytime violates Penal Code section 844. We answer this question, "yes."

The recent case of *People* v. *Bradley* (1969) 1 Cal.3d 80, 87 [81 Cal.Rptr. 457, 460 P.2d 129], holds that section 844 must be complied with where officers walk into a dwelling through an open door at night-time when the occupant apparently is asleep. Here the officer states that he did not observe anyone sleeping in the apartment when he effected entry; yet the fact is that there were occupants inside, sleeping with large butcher knives alongside their beds. The reality of the potential harm from an occupant being suddenly aroused in his sleep and grabbing a knife for self-defense purposes is evident. The officer, not knowing the actual interior circumstance, could have and should have avoided possible repercussions from such a hazardous situation by simply knocking or otherwise attracting the attention of persons who might be inside, as section 844 enjoins. Given the important social policies underlying section 844, we see no reason in the factual context of this case to distinguish between nighttime and day-time open-door entries, and we hold that the entry herein was a type of "breaking" covered by section 844.

■ Section 844 was enacted by the Legislature to protect the funda-mental right of privacy of dwelling occupants and to insure the safety of the police, innocent bystanders, and occupants, who may be injured as a consequence of violent resistance to unannounced entries. (*Greven* v. *Superior Court* (1969) 71 Cal.2d 287, 291-293 [78 Cal.Rptr. 504, 455 P.2d 432]; *People* v. *Rosales* (1968) 68 Cal.2d 299, 304 [66 Cal.Rptr. 1, 437 P.2d 489]; *People* v. *Bradley* (1969) *supra,* 1 Cal.3d 80, 90, Tobriner, J. concurring and dissenting; *Miller* v. *United States* (1958) 357 U.S. 301, 313 [2 L.Ed.2d 1332, 1340, 78 S.Ct. 1190, 1197]; *Ker* v. *California* (1963) 374 U.S. 23, 47-59 [10 L.Ed.2d 726, 746-753, 83 S.Ct. 1623, 1636-1642], Brennan, J. dissenting.) ■ Since the privacy of an indi-vidual may be invaded during the daytime equally as well as during the nighttime and unexplained daytime entries may frequently be met with

violent reaction, we agree with *People* v. *Beamon* (1968) 268 Cal.App.2d 61, 65 [73 Cal.Rptr. 604], that ". . . an open door does not excuse non-complaince with section 844 unless noncompliance is otherwise excused under the rule declared in *Rosales*. Accordingly, a peace officer may not enter through an open door of a house without first demanding admittance and explaining the purpose for which admittance is desired unless he reasonably and in good faith believes that such compliance would increase his peril, frustrate an arrest, or permit the destruction of evidence. We are persuaded to this conclusion by the purpose of section 844 as declared in *Rosales* and by the clear language of the section which does not restrict the required announcement to any particular type of entry by the police officers. [Citation.] Moreover, if analogy to the law of burglary is required, we note that in California no breaking or forceable [*sic*] entry is required in proof of the commission of a burglary [citations] and, accordingly, that a burglary can be committed by entering through an open door or window. [Citation.]" (Footnote omitted.) (Accord: *People* v. *Norton* (1970) 5 Cal.App.3d 955 [86 Cal.Rptr. 40].) As pointed out in *People* v. *Bradley* (1969) *supra*, 1 Cal.3d 80, 88, "[t]he burden of complying with the demand and explanation requirements of section 844 is slight, and in view of the special circumstances under which noncompliance with section 844 is excused, insistence upon compliance in the absence of those circumstances in a case like the instant one should not result in any undue impairment of lawful police action." Furthermore, it should be noted that the court in *Bradley,* while not deciding, suggested that officers should always demand admittance and explain the purpose for which admittance is desired (unless strict compliance with section 844 is otherwise excused) before they enter a dwelling through an open door for the purpose of executing an arrest. (*Id.* at p. 88, fn. 1.)

 By failing to knock at the bedroom door or employ other reasonable means to give notice of his presence and to identify himself as a police officer, Delong did not meet the minimum essential requirements of section 844, nor did he substantially comply therewith. (*Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 319 [82 Cal.Rptr. 348, 461 P.2d 628]; *Greven* v. *Superior Court* (1969) *supra,* 71 Cal.2d 287, 290-292; *People* v. *Marshall* (1968) 69 Cal.2d 51, 55-56 [69 Cal.Rptr. 585, 442 P.2d 665].) Any evidence obtained as a result of an illegal entry in violation of that statute must be excluded. (*Duke* v. *Superior Court* (1969) *supra*, 1 Cal.3d 314, 325; *People* v. *De Santiago* (1969) 71 Cal.2d 18, 30 [76 Cal.Rptr. 809, 453 P.2d 353]; *Mapp* v. *Ohio* (1961) 367 U.S. 643, 655,

660 [6 L.Ed.2d 1081, 1089-1090, 1093, 81 S.Ct. 1684, 1691, 1694, 84 A.L.R.2d 933].) ▮▮▮ The fact that two stolen business machines may have been in "plain view" from outside the apartment does not otherwise render them admissible in evidence. (See *People* v. *Berutko* (1969) 71 Cal.2d 84 [77 Cal.Rptr. 217, 453 P.2d 721]; *People* v. *Douglas* (1969) 2 Cal.App.3d 592 [82 Cal.Rptr. 718].)

Defendant's motion to suppress the real evidence under the Penal Code section 1538.5 motion should have been granted.

The judgment and order granting probation are reversed.

Stephens, Acting P. J., and Reppy, J., concurred.