[Crim. No. 8099. Fourth Dist., Div. One. Dec. 24, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEXANDER SCHMEL, Defendant and Appellant.

**COUNSEL**

John Y. Tremblatt for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jeffrey A. Joseph and Cecelia H. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WHELAN, J.**\*—Defendant Alexander Schmel pleaded guilty to a charge of possessing marijuana for sale, after his motion to suppress evidence was denied, and has appealed from an order granting probation.

Defendant's appellate contentions may be summarized as follows:

The seizure of the contraband sought to be suppressed was illegal because it was the result of an unlawful entry into the house by the officers, and was seized in a room in that house into which the officers had no right to enter since they had no search warrant.

It is not contended that the officers did not have probable cause to enter the house to make an arrest for a felony, but that they failed to comply with Penal Code section 844; and no contention is made the contraband seized was not in plain view in the room in which it was found.

A recital of the facts disposes of all the appellate contentions and supports the order denying the motion to suppress.

At about 3:30 on the afternoon of September 30, 1974, defendant guided Gerald Richard Briggs and Herbert Meisner, State Bureau of Narcotics Enforcement officers, to a house in Chula Vista. In the car with Briggs, Meisner and defendant was Michael Hassay, an identified informer, who had carried on extended negotiations with defendant for the purchase by Briggs and Meisner of 150 kilos of marijuana.

In the course of the trip to Chula Vista, defendant told Meisner the men at the house where the marijuana was located were his regular people; two of them would not be seen and would be in another room.

Upon arrival at the house defendant and Hassay entered. Steven Mark Meyers, John Ruane and "Casey" Sipes were in the living room into which the front door opened. Defendant and Hassay went with Sipes into a bedroom where Hassay saw a brick-shaped paper-wrapped package which was open and contained marijuana; he was shown a large pile of such packages from which a covering blanket was removed.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

While that was being done Ruane stood at the bedroom door in a position to see the front doorway which was open except for the screen door.

After some talk about going out for the money, Hassay and defendant left the house after having been there two to three minutes. Outside, at the car, Hassay told Meisner of the large amount of marijuana he had seen in the closet in a bedroom, and that he had seen three or four persons in the house. Defendant was then placed under arrest.

Meisner and supporting officers next moved rapidly from their car to the front door.

At the front door, which was open and had been open before defendant and Hassay entered, Meisner, through the screen door, saw several males in the living room, and announced: "Police officers. We have reason to believe a felony is being committed within these premises. We're demanding entrance." Briggs and Meisner displayed their badges through the screen. Briggs saw human figures moving within the room. Meyers, from inside, and presumably his companions, could see the officers even before they reached the screen door. Meisner then opened the screen door and entered, followed by Briggs. In the living room were Sipes, Ruane and Meyers, who were placed under arrest. Meisner and Briggs went immediately through the other rooms in the house looking for anyone else who might be there. They entered first the bedroom visited by Hassay, where they saw the opened package of marijuana on the bed and the pile of marijuana, partially uncovered, in the closet. There was no other person in that room at the time.

A fourth man, Mark Hudner, who had been in the house, was arrested outside. When and how he left the house does not appear, but Meyers, who was a defense witness at the suppression hearing, testified Hudner had been in the house.

After seeing the marijuana and advising Sipes and Ruane of their Fifth and Sixth Amendment rights, Briggs asked permission to search from Sipes and Ruane, whom he believed to be the tenants. They refused. Briggs then told them that on the basis of that refusal he was forced to apply for a search warrant. Sipes and Ruane then said they had changed their minds and consented to a search. That search turned up 4.2 grams of loose marijuana and smoking paraphernalia in the living room, and other evidence connecting Sipes and Ruane with the house.

Penal Code section 844 reads: "To make an arrest, a private person, if the offense be a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired." ■ Its provisions apply to an entry made to make a felony arrest with or without a warrant.

Defendant contends there is necessarily implied in section 844 a provision such as found in Penal Code section 1531, that only after admittance is refused may an officer, otherwise entitled to enter a house to make an arrest, make his entry. "[F]or many purposes the cases applying one or the other of the statutes may be interchangeably cited." (*People* v. *Peterson,* 9 Cal.3d 717, 722 fn. 7 [108 Cal.Rptr. 835, 511 P.2d 1187].) Thus they are identical in their requirement of an announcement by the officer (*Greven* v. *Superior Court,* 71 Cal.2d 287, 292 [78 Cal.Rptr. 504, 455 P.2d 432]).

■ The legislative history of sections 844 and 1531 persuades us that the Legislature purposely omitted from section 844 the requirement of section 1531 that entry be made only after a refusal of admittance, and we so hold.

Section 135 of the Criminal Practice Act of 1851, the forerunner of the present-day section 844, required an officer give notice of his "authority and purpose" and "be refused admittance." (Stats. 1851, ch. 29, § 135, p. 226.)

In 1872, Penal Code section 844 was first enacted. The refusal requirement was deleted and two provisions were added: a requirement that the officers know or reasonably believe the arrestee is in the house, and a requirement that the officers demand admittance. In 1873-1874, the section was reworded, without changing its substance, to read as it does today (Stats. 1873-1874, ch. 614, § 40, p. 435).

At the same time, section 132 of the Criminal Practice Act of 1851, the forerunner of section 1531, provided for a refusal requirement (Stats. 1851, ch. 29, § 132, p. 226). That provision was retained in section 1531 as it was enacted in 1872.

■ Where the Legislature undertakes to amend existing law by deleting an express provision of the previous statute, it is presumed the Legislature intended a change in the law (*People* v. *Valentine,* 28 Cal.2d 121, 142 [169 P.2d 1]; *People* v. *Perkins,* 37 Cal.2d 62, 63-64 [230 P.2d 353]).

The Legislature, by deleting the refusal provision from section 844, and retaining it as part of section 1531, expressed an intent to create different requirements for each situation (*People* v. *Valentine, supra,* 28 Cal.2d 121, 142; *People* v. *Norwood,* 26 Cal.App.3d 148, 156 [103 Cal.Rptr. 7]).

We need not discuss the legislative purpose beyond noting that the arrest of a person reasonably believed to be in a house may call for more instant action than the seizure of inert things, which, while they may be moved, cannot move themselves, and are often the object of search in vacant premises or premises occupied by persons innocent of a criminal connection with the object sought. It is, perhaps, for those reasons also that a lawful arrest of a person reasonably believed to have committed a felony may be made by day or night with or without a warrant; while the search for property, though under a warrant, may be circumscribed as to the time when it is to be made.

Certainly no apparent legislative purpose could be served by a requirement of waiting for a refusal from men visible to the officers and to whom the officers are visible and audible, through a screen door at midafternoon. In saying this we recognize that where statutory requirements exist they must be complied with, since the statute covers all situations, not only the one under consideration.[1]

■ We hold also that under the facts the trial court's finding must be upheld that the officers reasonably could and did believe there might be at least one other person in the house after finding only three in the living room. There had in fact been a fourth man in the house; and Meisner had information from Hassay he had seen three or four men in the house. The rule of *People* v. *Block,* 6 Cal.3d 239, 246 [103 Cal.Rptr. 281, 499 P.2d 961], is applicable.

---

[1]It is not unlikely that persons in the position of the defendants have been schooled to wait to see how long it is before an officer makes an entry after his demand, just in case he should enter too soon for a refusal to be inferred.

The officers were not engaged in an illegal search when they entered a bedroom nearest the living room to look for possible other persons and there saw marijuana in plain view, which then became subject to seizure.

The order appealed from is affirmed.

Ault, Acting P. J., and Cologne, J., concurred.