[Crim. No. 14284. First Dist., Div. Two. Oct. 14, 1976.]

THE PEOPLE, Plaintiff and Appellant, v.
DOUGLAS MICHAEL BALDWIN et al.,
Defendants and Respondents.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, W. Eric Collins and James D. Hurwitz, Deputy Attorneys General, for Plaintiff and Appellant.

Michael E. Ballachey and R. Zachary Wasserman, under appointment by the Court of Appeal, James C. Hooley, Public Defender, E. Craig Goldman and Scott Spear, Assistant Public Defenders, for Defendants and Respondents.

## OPINION

**TAYLOR, P. J.**—The People appeal from an order dismissing the information[1] pursuant to Penal Code section 1385 after the granting of a defense motion to suppress evidence pursuant to Penal Code section 1538.5, on grounds that all of the evidence acquired by the police after the arrest of defendant Baldwin was "fruit of the poisonous tree," namely, the unlawful search of the home after the arrest. The People contend that: 1) the smell of marijuana detected by the arresting officers was a sufficient basis, without more, to provide probable cause sufficient to preserve the validity of the search warrant; 2) the arresting officers had probable cause to investigate the Baldwin residence and to arrest defendants Martinez and Baldwin; 3) the entry of the house was lawfully made since Penal Code section 844 was not applicable, or, if so, there was substantial compliance with its requirements; and 4) there was probable cause to arrest defendant Cano, since she was plainly in view of the officers as they entered the house during the arrest of Martinez and

---

[1]The information charged all three defendants with three counts of possession for sale of controlled substances (Health & Saf. Code, § 11378) and two counts of possession for sale of marijuana (counts I-IV, Health & Saf. Code, § 11359); only defendants Martinez and Cano were charged with an additional count of possession of marijuana for sale (count V, Health & Saf. Code, § 11359); only defendant Baldwin was charged with growing and processing marijuana (count VI, Health & Saf. Code, § 11358).

Baldwin. Baldwin and Martinez also urge that the scope of the search for additional suspects and the "freezing" of the residence was unlawful and that the warrant, even with the unlawfully obtained evidence excised, was the "fruit of the poisonous tree." The major issues on appeal are whether there was an initial invasion of a private area protected by the Fourth Amendment of the federal and state Constitutions, and the application of the knock and notice requirements of Penal Code section 844 and of *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]. For the reasons set forth below, we have concluded that the court erred in dismissing the information.

Preliminarily, we turn to the procedural issues pertaining to the scope of review. The record indicates that defense motions, pursuant to Penal Code sections 995 and 1538.5 were made on February 18, 1975, and subsequently heard and argued. On April 9, 1975, the 995 motion was denied and the 1538.5 motion granted. Subsequently, pursuant to Penal Code section 1385, the motion to dismiss as to all three defendants was granted on the grounds that although the initial entry and arrests were lawful, pursuant to Penal Code section 844 and *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], all of the evidence acquired by the police after the arrest of Baldwin was "fruit of the poisonous tree." Thereafter on January 23, 1976, this court granted the People's motion to augment the record with the transcripts of the preliminary hearing[2] and the hearing on the 995 and 1538.5 motions. The only evidence before the superior court at the suppression hearing was the testimony of Officers Hoffman and Stover, although references were made to the facts adduced at the preliminary. During the discussion on the 995 motion, the court indicated it had read the transcript of the preliminary hearing, but indicated that neither the preliminary transcript nor the search warrant was considered at the time the motion to dismiss was granted.

Thereafter, the People, erroneously believing that the preliminary transcript was properly a part of the record on appeal, filed their first opening brief containing references to the preliminary hearing with this court on November 5, 1975. ▮ ▮▮▮ After Baldwin's counsel pointed out that the transcript of the preliminary was never introduced into evidence before the superior court,[3] the People, relying on *People* v.

[2]The search warrant, its supporting affidavit, and the physical evidence seized on its execution were admitted into evidence at the preliminary examination.

[3]The additional defense briefs on appeal, filed by Martinez and Cano, both refer to portions of the preliminary transcript. However, a motion to suppress evidence is a de novo hearing in the superior court (Pen. Code, § 1538.5, subd. (i)). The transcript of the

*Cagle,* 21 Cal.App.3d 57 [98 Cal.Rptr. 348], first argued that the case gives a reviewing court the discretion and authority to review the transcript of the preliminary hearing.[4] Subsequently, this court granted the People's motion to file a revised opening brief that made no reference to the preliminary transcript; this brief was filed on February 11, 1976. The People, pursuant to *Cagle, supra,* and California Rules of Court, rule 12, also move to augment the record with the search warrant, its affidavit and return.

Viewing the record of the suppression hearing most strongly in favor of the specific findings and order of the court below, as we must, the following pertinent facts appear: About midnight on November 6, 1974, Fremont Police Officer Hoffman was on routine patrol in the "Gentry Plan," a relatively isolated residential section in the northwest portion of the city that had a high burglary rate per capita of housing during the preceding six months.[5] Hoffman noticed that the windows of a pickup truck parked in front of the house at 32978 Lake Michigan Avenue were not covered with moisture. As the windows of most of the vehicles parked in the neighborhood were vaporized, Hoffman assumed that the truck had recently arrived and believed that a burglary might be in progress. His suspicions were confirmed when he looked into the truck and noticed a dog and several tool boxes. In addition, a dim light shone from the front window. Hoffman believed that a flashlight could be the source of the dim light. Accordingly, he ran a police radio check on the pickup and received information that the truck was registered in San Leandro to defendant Martinez; there were no outstanding warrants on the truck or Martinez.

Based on his observation of a recently arrived out-of-town truck with tool boxes and a dog, the dim light in the house and his knowledge of the

testimony taken at the preliminary examination is not ipso facto admissible at the superior court hearing. Absent a stipulation, neither the People nor the defendant can present the testimony taken at the preliminary examination at the superior court hearing unless the provisions of Evidence Code section 1291 governing use of former testimony are met (*Hewitt* v. *Superior Court,* 5 Cal.App.3d 923, 927-928 [85 Cal.Rptr. 493]; *People* v. *Cagle,* 21 Cal.App.3d 57, 60 [98 Cal.Rptr. 348]). No stipulation was made or entered on the record here.

[4]The appellate court did so reluctantly in *Cagle* (at p. 62) in order to reach the merits, as the record before it was "a sloppy one from beginning to end," and did not disclose whether or not the preliminary transcript had been considered by the superior court. We do not think *Cagle* is applicable here as the record specifically indicates that the superior court did not consider the preliminary transcript or the search warrant in ruling on the suppression motion. We note that no petition for a hearing to our Supreme Court was ever filed in *Cagle* and that this aspect of *Cagle* has not been cited or discussed.

[5]His information was based on the weekly statistical report sent out by his department.

high burglary rate in the neighborhood, Hoffman concluded that a burglary might well be in progress. He checked the windows and front door of the home for signs of forced entry and found none. However, he heard what sounded like the sliding of a chain lock and stood and listened at the door. Hoffman then knocked "pretty loud" on the door and received no response; his second knock also produced no sound from within. Hoffman, however, believed that "possibly there was someone . . . inside . . . [who] didn't want to respond." He knocked a third time. Finally, defendant Baldwin opened the door a few inches. To his surprise, Hoffman was overwhelmed by the smell of burning marijuana and stepped back. He then asked Baldwin whether Martinez was inside and asked to talk to him in order to "stall for a little bit of time . . . to think," and Baldwin agreed. Baldwin stepped back into the home and closed the door behind him. Hoffman made no attempt to arrest Baldwin, but instead walked down the driveway to meet Officer Stover, who had responded in three minutes to Hoffman's call for assistance. Hoffman and Stover conversed for a brief period, then returned to the front porch and "waited for a period of time," intending to arrest "those people inside the residence" for knowingly being in a place where marijuana was being used. Hoffman could not remember whether he again knocked on the door, but did not believe he did so. When Martinez opened the door and came outside, Hoffman placed him under arrest for knowingly being in a place where marijuana was used (Health & Saf. Code, § 11365),[6] a misdemeanor (Pen. Code, § 17, subd. (a); Health & Saf. Code, §§ 11362, 11374). Stover was also conscious of the strong smell of marijuana when the door opened as Martinez came out.

Although Hoffman could not see anyone else inside the home and was not certain whether anyone was behind the door, he put his foot in the doorway. When the door began to close, Hoffman "kind of knocked and pushed . . . opening the door back up" and stepped through the doorway into the home. At first, Hoffman did not see anyone inside, but then discovered Baldwin behind the door and also placed him under arrest for the same offense as Martinez (Health & Saf. Code, § 11365). Stover also entered. Admittedly, neither officer had obtained a search warrant.

---

[6]The statute provides, so far as pertinent, that: "It is unlawful to visit or to be in any room or place where any controlled substances which are specified in . . . subdivision (d) of [Health & Saf. Code] Section 11054 . . . are being unlawfully smoked or used with knowledge that such activity is occurring." Marijuana is so specified by Health and Safety Code section 11054, subdivision (d)(10).

After the entry, Hoffman ordered Baldwin and Martinez into the living room; there, Hoffman first saw Cano seated on the couch. Hoffman then placed all three under arrest for presence in a place where marijuana was being used (Health & Saf. Code, § 11365). Neither officer met any physical resistance from Martinez, Cano or Baldwin. Baldwin at all times was cooperative. When Stover asked if anyone else was in the house, Baldwin indicated that other occupants of the premises were absent and that the only other person present was his little sister, who was asleep upstairs. Stover proceeded upstairs and found the little girl asleep.

After returning downstairs to the dining area, Stover saw a "roach" and clay pipe on the table. Hoffman, who had remained downstairs to watch the three arrested defendants, had also seen the table, but was unable to identify the items on it as contraband.

However, disbelieving Baldwin's statement and relying on the "possibility" that some additional persons were present in the home, Stover proceeded to search the unlighted back rooms downstairs with a flashlight. Stover found narcotics and marijuana in various stages of growth and returned to the living room. Stover informed Hoffman of the contents of the downstairs rooms. Hoffman then told defendants they were also under arrest for unlawful possession of marijuana (Health & Saf. Code, § 11378). Then, Hoffman and Stover "froze" the premises and at 6:30 a.m. on November 7, 1974, obtained a search warrant based on the affidavit of Officer Johnson, who arrived at the scene later and received a description of the foregoing events from Hoffman and Stover.

■ We turn first to the question of whether Hoffman's initial eavesdropping and knocking at the front door, as the People argue, was a lawful invasion of privacy, permitted by the Fourth Amendment of the United States Constitution, the parallel provisions of the state Constitution (art. I, § 19),[7] and the recently enacted specific privacy provisions of our state Constitution,[8] adding privacy as a fundamental right (art. I, § 1,

[7]The test of an unreasonable search and seizure is the same under this provision of the state Constitution as under the Fourth Amendment (*People* v. *Cahan,* 44 Cal.2d 434, 438 [282 P.2d 905, 50 A.L.R.2d 513]; *People* v. *Johnson,* 153 Cal.App.2d 870, 873 [315 P.2d 468]).

[8]Thus, the specific provision declaring privacy a fundamental right was in effect for several years before the events of the instant case which occurred on November 6, 1974. No similar provision pertaining to privacy is found in the language of the federal Constitution, but the federal right has been based on case law (*Roe* v. *Wade,* 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705]; *Griswold* v. *Connecticut,* 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]).

so amended by the voters in Nov. 1972, and subsequently reworded by constitutional amendment on Nov. 5, 1974; *White* v. *Davis,* 13 Cal.3d 757, 773 [120 Cal.Rptr. 94, 533 P.2d 222]).

The undisputed facts show that Hoffman's initial approach to the Baldwin home was made in good faith and during a routine patrol of an isolated residential area with a history of a high burglary rate per capita of housing on the basis of the weekly statistical reports made by the Fremont Police Department. We agree with the express finding of the distinguished trial judge below that the entry and arrests did not constitute an intrusion on the privacy rights of defendants, and were lawful.

Clearly, as each of the defendants argues, the protection of the Fourth Amendment extends more stringently to the expectation of privacy of a person in their homes than on the public streets or elsewhere at night. Defendants rely chiefly on the analogy of the on-the-street detention cases, and authorities such as *Lorenzana* v. *Superior Court,* 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33].[9] We think that neither *Lorenzana* nor the on-the-street detention cases[10] provide an apt analogy here, for in each of those cases, the suspicion of the officers had focused on the particular defendant or premises, and they then proceeded to engage in unlawful conduct or trespass to obtain additional information against the suspected violator. For the same reasons, *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507][11] and *United States* v. *Case,* 435 F.2d 766, are also not helpful here.

---

[9] In *Lorenzana,* the trespass by a policeman over private property to which the public had not been expressly or impliedly invited, was held, at page 641, a violation of the right of privacy protected by the federal and state Constitutions. After discussing the applicable authorities, the court said at page 634: "These cases clearly demonstrate the salutary rule of law that observations of things in plain sight *made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful unless executed pursuant to a warrant or one of the established exceptions to the warrant requirement.*" (Italics supplied.)

[10] *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]; *Flores* v. *Superior Court,* 17 Cal.App.3d 219 [94 Cal.Rptr. 496]; *People* v. *Manis,* 268 Cal.App.2d 653 [74 Cal.Rptr. 423].

[11] *Katz* held unlawful the governmental practice of eavesdropping without a warrant on the suspect's telephone conversations occurring in a public telephone booth.

In *United States* v. *Case,* 435 F.2d 766, 768, the court held that "surreptitious listening to the conversations in Case's store by the [federal] agents stationed in the hallway was an invasion of the defendant's right to privacy" on the basis of *Katz.*

Defendants urge that the right to privacy in the home includes the reasonable expectation that officers will not, without just cause, insist upon confronting occupants by knocking loudly and repeatedly on the front door in the middle of the night[12] nor that they will arbitrarily listen at a private doorway. Defendants conclude they are indistinguishable from any citizen who goes quietly about his business behind his own locked door.

We agree with defendants' premises but not their conclusion. Here, unlike the officers in the authorities cited by defendants, Hoffman had no reason to suspect the occupants of the premises. In the performance of his routine nightly patrol duties in an isolated and known high burglary area, he noticed a recently arrived out-of-town truck with a dog and tool boxes in it and a dim light shining from the front window, which he believed to be a flashlight. The court below had the opportunity to hear the testimony and observe the demeanor of Hoffman and Stover at the suppression hearing. From its express findings that the arrests of Martinez and Baldwin were legal, we can only conclude that the trial court believed Hoffman as to his good faith and intent, and are bound by its findings of fact (*People* v. *Superior Court (Peck)* 10 Cal.3d 645, 650 [111 Cal.Rptr. 565, 517 P.2d 829]; *Mann* v. *Superior Court,* 3 Cal.3d 1, 7 [88 Cal.Rptr. 380, 472 P.2d 468]).

■ The Fourth Amendment and the pertinent state constitutional provisions forbid " '. . . not all searches and seizures, but [only] unreasonable searches and seizures' " (*Terry* v. *Ohio, supra,* p. 9 [20 L.Ed.2d pp. 898-899]). "Reasonable cause" to conduct an investigation is not merely a subjective standard, but one which demands that ". . . the

---

[12]Defendants rely on Penal Code section 840, which generally prohibits the service of arrest warrants for misdemeanors between the hours of 10 p.m. and 7 a.m. of the next day, and Penal Code section 1533 which provides that in the absence of a direction that a search warrant may be served at any time of day or night, the warrant shall be served only between 7 a.m. and 10 p.m. " 'The legislative purpose was [in part] to protect people in the security of their homes at night' " (*Paddleford* v. *Biscay,* 22 Cal.App.3d 139, 142 [99 Cal.Rptr. 220]). Similarly, Penal Code section 1531 generally restricts the service of search warrants and has been used to justify the holding that knock-notice cannot be expressly excused where an entry pursuant to a search warrant occurred at night in the absence of emergency conditions (*Parsley* v. *Superior Court,* 9 Cal.3d 934 [109 Cal.Rptr. 563, 513 P.2d 611]). However, as indicated above, we agree with the court below that these provisions are not applicable here. In any event, as *Parsley, supra,* indicates, Penal Code section 1531, like Penal Code section 844, discussed below, is a codification of the common law and subject to the same exceptions discussed in a subsequent portion of this opinion (*People* v. *Dumas,* 9 Cal.3d 871, 879 [109 Cal.Rptr. 304, 512 P.2d 1208]; *People* v. *Henderson,* 58 Cal.App.3d 349, 355 [129 Cal.Rptr. 844]).

facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate . . . . [Citations.] . . . 'If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' [Citation.]" (Pp. 21-22 [20 L.Ed.2d pp. 905-907].)

We think that the record of the suppression hearing here amply supports the finding that, on the basis of the facts known to Hoffman at the time he approached the Baldwin home, he acted reasonably in knocking on the front door. In good faith, he was attempting to protect the home and its occupants from a possible burglary. This is the proper, lawful and historic function of police officers and they should not be deterred from this valuable and basic service to the community. Like the Fourth Amendment, this kind of lawful activity of the police also serves to protect the privacy and safety of persons in their homes.

We think the facts summarized above supply an eminently reasonable basis for Hoffman's suspicion of a burglary in progress. The hour was 12:30 a.m. Initially, the officers knew of the high burglary frequency in the vicinity. A recently arrived truck from out of town containing tool boxes and a dog reasonably leads to the conclusion that a quick departure is anticipated. The sighting of a dim light through the front window is consistent with the use of a flashlight. On the basis of these observations, Hoffman reasonably proceeded to the porch of the home to examine the door and windows for any attempted tampering and entry.

The fact that while on the porch at the front door the officer overheard the chain lock sliding, was not eavesdropping in the context of Katz and similar authorities. Hoffman, under the circumstances, acted reasonably in knocking to ascertain in good faith whether everything was all right, at that hour, in that neighborhood, with its six-month history of a high burglary rate per capita of housing. What occurred after the door opened was a total and unexpected surprise for Hoffman. In view of his unexpected experience of being overwhelmed by the smoke of a large amount of marijuana, his subsequent decision to stall and call for help was also an eminently reasonable and prudent one under the circumstances. Hoffman knew from the initial opening of the door by Baldwin and Baldwin's agreement to send Martinez out that at least two adult males were present.

We turn next to the lawfulness of the arrests of Baldwin and Martinez and the entry of the officers into the home. We, accordingly, discuss the contentions pertaining to Penal Code section 844.

Defendants concede that Hoffman had probable cause to arrest Baldwin after he initially opened the door and overwhelmed Hoffman with the marijuana smoke. They further properly point out that the law distinguishes between probable cause to arrest and entry into a home to make that arrest. This argument, of course, overlooks the fact that the arrest of Martinez occurred outside the home, just as Baldwin was attempting to close the door. Under these circumstances, Baldwin could hardly avoid overhearing the arrest of Martinez for a violation of Health and Safety Code section 11365 and his attempt to close the door can only be viewed as an attempt to protect himself and the other inhabitants from being arrested for the same offense. The fact that Martinez was sent outside to be arrested and Baldwin's unsuccessful attempt to close the door can only be viewed as an evasionary and surreptitious tactic analogous to the flushing of contraband down the toilet, given the nature of the offense (cf. *People* v. *Glasspoole,* 48 Cal.App.3d 668, 674 [121 Cal.Rptr. 736]; *Hernandez* v. *Superior Court,* 16 Cal.App.3d 169, 172 [93 Cal.Rptr. 816]; in both at the time of entry, the person inside the residence tried to close the door).

To justify an entry into a home, there must be substantial compliance with section 844, or a legally recognized excuse for noncompliance (*People* v. *Leighter,* 15 Cal.App.3d 389, 397 [93 Cal.Rptr. 136]). Penal Code section 844 requires a police officer to announce his authority (i.e., identify himself), state his purpose, and demand entry before he may "break open the door or window of a house" to make an arrest. The purpose of the statute is to protect fundamental rights " '. . . which safeguard individual liberty' [citations], [as well as] to preclude violent resistance to unexplained entries and to protect the security of innocent persons who may also be present on [the] premises . . ." (*People* v. *Rosales,* 68 Cal.2d 299, 304 [66 Cal.Rptr. 1, 437 P.2d 489]). "Breaking" includes uninvited entries through open doors (*People* v. *Bradley,* 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129]; *People* v. *Arias,* 6 Cal.App.3d 87 [85 Cal.Rptr. 479]), even where the door is opened in response to a police officer's knock (*People* v. *Leighter, supra*) or when an officer forcibly widens the opening of a partially closed door,

as the term is defined under common law (*People* v. *Hayko,* 7 Cal.App.3d 604 [86 Cal.Rptr. 726]).[13]

■ Defendants here argue that Hoffman's conduct, as well as Stover's, following the arrest of Martinez outside the home, constituted a "breaking" under the above authorities, as Hoffman stepped into the path of the door and struck it with his hand, and thereby forced it to open wider. Defendants also urge that in any event, Hoffman and Stover were guilty of a constructive breaking when they stepped over the threshold to seek Baldwin, and cite *People* v. *Keogh,* 46 Cal.App.3d 919 [120 Cal.Rptr. 817], which held at page 927 that " 'Entry' [as restricted in § 844] includes passing through an open door" and that "statements made *during* entry do not fulfill the statutory requirements . . . which compel . . . notice *prior* to entry . . ." (italics partially added).

■ However, compliance with Penal Code section 844 has been excused in instances where at the time the door is opened the officer perceives an occupant actually engaged in the commission of a narcotics offense in his immediate presence (*People* v. *Glasspoole,* 48 Cal.App.3d 668 [121 Cal.Rptr. 736]; *People* v. *Peterson,* 9 Cal.App.3d 627 [88 Cal.Rptr. 597]). The rationale underlying the exceptions to the knock and notice requirements of the statute is twofold. First, the occupant's privacy rights are not invaded where the offense is committed in front of an officer who has a right to be there, since no "breaking" was made for the discovery; the offender in plain sight may be seized without further notice. Second, the officer can no longer protect his safety, or that of others, by precluding a surprise entry with a formal announcement; hence, he probably risks less danger in acting quickly rather than pausing to make the announcements (*People* v. *Peterson, supra,* p. 633). Accordingly, where an officer entertains a reasonable and good faith belief that compliance with the requirements of the statute will frustrate the arrest or permit destruction of evidence, he may properly omit compliance (*People* v. *Dumas,* 9 Cal.3d 871 [109 Cal.Rptr. 304, 512 P.2d 1208]; *People* v. *Bigham,* 49 Cal.App.3d 73 [122 Cal.Rptr. 252]).

[13]In *Hayko, supra,* at page 607, a uniformed police officer knocked on the door, a woman opened it about eight inches, and the officer "then slapped the door with his foot [pushing it farther open] and entered." The People, however, had conceded that the manner of entry constituted a breaking.

■ We think that here, as in *Glasspoole* and *Peterson, supra,* after the door opened and Martinez emerged and Hoffman and Stover were both aware of a quantity of marijuana smoke, which indicated the extensive use and consumption of large amounts of an unlawful substance within the house, the officers were face to face with a person committing an offense at the time of entry. Further, when the door began to close quickly behind Martinez, Hoffman and Stover were faced with exigent circumstances that required them to enter before the person behind the closing door had the opportunity to escape or destroy the contraband. These facts provide additional support for the finding of the court below that the resulting arrests of Martinez and Baldwin were legal (see also *People* v. *Boone,* 2 Cal.App.3d 66 [82 Cal.Rptr. 398]).

*Leighter,*[14] *supra,* is particularly apt as there the officer followed the defendant inside after she opened the door and exposed marijuana smoke. Although the officer did not immediately place her under arrest, the entry made for that purpose occurred at the instant the officer faced her, and the validity of the arrest was upheld. The unannounced entry preceding the arrest was justified under the *Peterson* rationale that an officer, face to face with an offender, is entitled to go in and arrest for a criminal act committed in the officer's plain sight at that time. No "breaking" preceded the discovery, and any danger the officer might have risked in surprising the offender unaware could no longer be avoided by making a formal announcement—the offender was, at that instant, on notice. The same is true of Baldwin here, who was behind the door at the time of the arrest of Martinez and clearly could not help overhearing it. Accordingly, he was on notice and any further announcements to him pursuant to Penal Code section 844 would have been unnecessary. The same is true of defendant Cano, who was sitting on the living room couch and was undoubtedly aware of Hoffman's presence after his initial knock and the opening and closing of the door. In any event, at the time of Hoffman and Stover's entry, defendant Cano was on full notice and a formal announcement as to her would also have served no purpose.

Although, as defendants indicate, the evidence established that Hoffman's foot was in the doorway *before* it started closing, and that Hoffman could not have been certain that it was Baldwin who was

[14]See also *People* v. *Superior Court (Reilly)* 53 Cal.App.3d 40 [125 Cal.Rptr. 504]; *People* v. *Miller,* 33 Cal.App.3d 191 [108 Cal.Rptr. 788]; and *People* v. *Vasquez,* 1 Cal.App.3d 769 [82 Cal.Rptr. 131].

behind the door attempting to close it, these facts are not material. ▇ The test for compliance with section 844 *is the view of the situation from the perspective of the officer at the time of the entry* (*People v. Gastelo,* 67 Cal.2d 586, 587 [63 Cal.Rptr. 10, 432 P.2d 706]; *People v. Thornton,* 8 Cal.App.3d 741, 745 [87 Cal.Rptr. 535]). ▇ Here, at the time of entry, the officers were faced with Martinez, who had just emerged from the residence where a large amount of marijuana was smoked and another person also committing a misdemeanor offense in their presence and attempting to close the door to prevent their entry. ▇ As to defendant Cano, the authorities hold that the knock and notice requirements as to the persons at the door do not apply to additional occupants who do not come to the door (*People v. Murphy,* 42 Cal.App.3d 81, 88 [116 Cal.Rptr. 889]; *Beckers v. Superior Court,* 9 Cal.App.3d 953 [88 Cal.Rptr. 602]).

▇ We turn next to the scope of the search of the residence, as the record indicates that the court below also relied on *Chimel v. California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], for its order of dismissal. ▇ As the search of the house was made without a warrant, the burden rests with the People to show proper justification (*Dillon v. Superior Court,* 7 Cal.3d 305, 311 [102 Cal.Rptr. 161, 497 P.2d 505]). ▇ The search of the house cannot be justified as incident to the arrest of Martinez, as he was arrested outside the house (*Dillon, supra,* p. 311). Accordingly, the search must be upheld on the basis of the facts known to Stover after the arrest of Baldwin and Cano. As stated in *People v. Block,* 6 Cal.3d 239 [103 Cal.Rptr. 281, 499 P.2d 961], in determining whether an officer's belief that others were present and the subsequent search for them was reasonable is "dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. . . . ▇ And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; . . . he must be able to point to specific and articulable facts from which he concluded that his action was necessary." (*Block, supra,* at p. 244.)

▇ Although the record of the suppression hearing indicates that Hoffman and Stover were not specifically asked to articulate the underlying facts supporting their belief that additional suspects may have been present, nonetheless, their testimony as to their conduct

demonstrates a reasonable disbelief of Baldwin's statement and indicates that their suspicion was supportable with articulable facts. After Hoffman and Stover entered, they knew only of the presence of Martinez and Baldwin; then they discovered Cano in the living room. They were told that Baldwin's sister was asleep upstairs and also that there were two other owners of the home who were not present. Hoffman and Stover also knew that Baldwin had tried to conceal himself behind the front door, tried to close the door during the arrest of Martinez when his own arrest was imminent. The record also indicates that Baldwin did not object to Stover's proceeding upstairs but did object to the search of the back of the house. Under all of the above facts and circumstances, Stover could have reasonably believed that Baldwin was lying and that others, perhaps the two "nonpresent" co-owners, may have been concealed upstairs; or as co-owners, might even have been present without Baldwin's knowledge (cf. *People* v. *Schmel,* 54 Cal.App.3d 46 [126 Cal.Rptr. 317]).

In *Block, supra,* a police officer, after arresting the defendant and five others during an alleged "pot party" at his house, went upstairs in search of other possible subjects and discovered marijuana. The court held that on the basis of the facts known to him, the officer had probable cause to believe that, after the arrests had been made, other suspects might be in the building and that he acted reasonably in making the upstairs search for them and in seizing the marijuana that was in plain view. That case is almost on all fours with the instant one. We can only conclude that Stover acted reasonably in disbelieving Baldwin's statement that only his little sister was present and in searching the premises for additional persons (*People* v. *Jordan,* 55 Cal.App.3d 965, 968 [128 Cal.Rptr. 147]).

 In addition, our Supreme Court has indicated that ". . . the scent of contraband within a residence may well provide, of itself, probable cause to search, and when conjoined with exigent circumstances may justify a warrantless search for and seizure of that contraband" (*Guidi* v. *Superior Court,* 10 Cal.3d 1, fn. 18, at p. 17 [109 Cal.Rptr. 684, 513 P.2d 908]).[15] Accordingly, we conclude that pursuant to the above

[15]The court carefully qualified the quoted statement by the following sentence: "We do not here hold that only the smell of contraband and nothing more would justify seizing a supposed container of the contraband, nor do we mean to accord 'plain smell' a place in Fourth Amendment doctrine equivalent to that occupied by 'plain sight.' " *Guidi* has since been characterized as a *pro tanto* overruling of the portion of *People* v. *Marshall,* 69 Cal.2d 51, 57, footnote 2 [69 Cal.Rptr. 585, 442 P.2d 665] (cited by defendants) that prohibited the seizure within a dwelling of evidence that would have been deemed permissible if present in a vehicle (*People* v. *Cook,* 13 Cal.3d 663, fn. 4, at pp. 668-669 [119 Cal.Rptr. 500, 532 P.2d 148]).

authorities, the court also erred in dismissing the information pursuant to *Chimel.*

Finally, we turn to the People's arguments pertaining to the subsequently obtained search warrant and the People's motion to augment the record on appeal with the warrant and the return. The record indicates that the court below made no ruling on the validity of the search warrant; accordingly, the matter is not before us, and the People's motion to augment is denied.

The order dismissing the information is reversed.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied November 12, 1976, and respondents' petition for a hearing by the Supreme Court was denied December 9, 1976.