Filed 11/18/22  P. v. Garcia CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>RAMON GARCIA, JR.,<br><br>  Defendant and Appellant. | F082678<br><br>(Fresno Super. Ct. No. F18901273)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Kathleen Sherman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Ramon Garcia, Jr. was convicted of possessing a firearm and ammunition as a felon.  He raises several challenges to the judgment, which we reject. We affirm the judgment.

## BACKGROUND

On May 15, 2018, the Fresno County District Attorney filed an amended information charging defendant with possessing a firearm as a felon (count 1; Pen. Code, § 29800, subd. (a)(1)),[1] possessing ammunition as a person prohibited from owning a firearm (count 2; § 30305, subd. (a)(1)), making a criminal threat (count 3; § 422), drawing or exhibiting a firearm (count 4; § 417, subd. (a)(2).)  The information further alleged defendant had previously suffered three prior strike convictions (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and three prior serious felony convictions (§ 667, subd. (a)(1).)

Defendant was initially represented by a public defender, but he was later appointed conflict counsel.

A jury convicted defendant of counts 1 and 2 and acquitted him of counts 3 and 4. Defendant admitted the three strike priors.

On count 1, the court sentenced defendant to the middle term of two years, doubled to four years pursuant to section 667, subdivision (e)(2)(C).  On count 2, the court sentenced defendant to a concurrent middle term of two years, doubled to four years.

The court reduced defendant's fine under section 1202.4 from $1,200 to $300 "in light of the Defendant's age."  The court also ordered a suspended fine of $300 under section 1202.45.  The court also imposed a $40 court security fee and a $30 assessment. The court declined to impose a $296 probation report fee due to defendant's age and period of incarceration.

## FACTS

Alexander Garcia is defendant's son.  In February 2018, Alexander lived with his mother (Teri Ronk) and his father (defendant).

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2.

One day in February 2018, Alexander's mother was moving out of the home. Alexander helped her move. The next day, Alexander came to retrieve his belongings because defendant had told him he could no longer live there. When Alexander arrived, the windows of the home were boarded up, and the deadbolt was "changed so you couldn't stick a key inside." Alexander went to the side of the house and tried to open the window to his bedroom. Inside was a man he had never seen before. Alexander went to the back door and squeezed his arm in to unlock it. Just as Alexander unlocked it, a different man opened the door and "got in [his] face." The man used vulgar language, telling Alexander he should not be there and that the man would hurt him. Alexander went to his room, locked the door and slid a couch in front of the door. Alexander saw that his room had been completely "trashed" and "[e]verything was thrown everywhere." Alexander's television, videogames, movies, and clothes were gone.

Alexander eventually went to leave through the front door, but its deadbolt would not open. There were "a bunch of other people inside the house." Alexander saw defendant in the back of the hallway. Defendant began threatening him. At trial, Alexander did not remember whether defendant was holding a shotgun at the time, but he did remember *telling police* that defendant was indeed holding a shotgun in his right hand. Defendant told Alexander he did not want to hurt him, but he will. Alexander told police that defendant said, " 'You need to get out of here, Mijo, before you get hurt.' " Alexander ran back into his room and called the police.

*The Shotgun*

Alexander purchased a shotgun when he was 17 years old. The shotgun was admitted into evidence as prosecution Exhibit No. 12A (Exhibit 12A). Alexander saw the shotgun two days before the February 16, 2018, incident. The shotgun was in one of the back closets in a room in the house. When asked if Exhibit 12A was the item he saw in defendant's hand in the hallway, Alexander testified: "Like I said, it was dark. I don't

3.

know. I just assumed." Body camera footage of a responding officer showed Alexander telling officers that defendant had been walking down the hallway carrying a shotgun.

*Officer Sean Clapper*

Officer Sean Clapper conducted a search of the residence. In the southwest corner bedroom of the residence, Clapper located a traffic ticket issued to defendant and a utility bill in defendant's name. Clapper also found 48 rounds of ammunition on a dresser in the bedroom. Forty-seven of the rounds were .357 Magnum rounds and one was a nine-millimeter Luger round.

Underneath the bed, Officer Clapper located a shotgun inside a case. Clapper testified that Exhibit 12A was the shotgun he found in the bedroom. When Clapper "ran" the serial number on the shotgun, "it said no records found." Clapper examined the shotgun. He pulled the trigger and heard a click indicating the internal hammer dropped. Clapper concluded that if there had been a live round in the gun, it would have gone off. Clapper did not test fire the gun at a range, nor did he examine the internal function of the gun.

*Alexander's Letter and Subsequent Conversation with Investigator*

After the incident, Alexander wrote a letter saying he never saw defendant with a gun in his possession. Alexander wrote the letter because he was asked to and was told it would help his father. Alexander had the letter notarized because he was told "that would make it official for some reason." When asked why he told police that defendant was holding a shotgun, he said it was because he believed the item was a shotgun. Now, however, he was not sure if the item was a shotgun or not.

When an investigator with the district attorney's office asked Alexander why there was a conflict between his statement to police and the written letter, Alexander said, "[I]t's just that his father had never aimed the gun at him." When Alexander saw defendant, "he had the shotgun pointed down to the ground."

4.

Alexander also initially told the investigator he had never seen the shotgun before. After the investigator confronted Alexander with a prior statement he had made, Alexander admitted he had purchased the shotgun "with" his brother, Carl Garcia. Alexander had been afraid to say anything about the shotgun because he had a prior conviction himself.

*Teri Ronk*

Teri Ronk testified that while they were not "legally" married, defendant was her common law husband. Ronk and defendant had been together for 43 years and had four children, including Alexander.

Ronk had been living with defendant for five years. Ronk and defendant shared a bedroom, which was the "master bedroom" of the home. This was a different bedroom than what she described as the "back two bedrooms" which were used for storage.

Ronk moved out on February 14, 2018. Alexander was with her as she moved out that day.

Officer Cha Thao testified that Ronk said she had seen defendant with a shotgun one year prior. Ronk denied this at trial.

Ronk also denied seeing defendant with a shotgun around February 2018 or any time before that in the home. Ronk said she told an officer that she had seen a shotgun belonging to her son in the house several years ago.

*Ruby Garcia*

Defendant's daughter, Ruby Garcia, does not live at the house where the incident occurred. Ruby testified that the back rooms of the home were used mostly for storage. When asked if anyone other than his parents had access to the rooms, she testified, "Um, not that I knew of, but I know after – well, I mean, they weren't – they were just – I guess anybody who was in the house." The rooms were not "blocked off."

During the years Ronk and defendant lived at the house, Ruby never saw defendant with a firearm, nor did she see a firearm in the home.

5.

*Deliberations and Exhibit 12A*

A minute order from day 5 of trial contains the following entries:

> "Jury is taken to the jury room to begin deliberations. The alternate jurors are kept apart. Counsel stipulate that the alternate jurors may be released and remain on-call. Time: 11:08 AM.

> "Court Orders Exhibit(s) Withdrawn. Court orders the following exhibits to be released.
> "With Photographic Record: People's 12 and 12A
> "Submitting Party and Number/Letter: 12, 12A
> "Released to: DA, Ashley Paulson

> "Jury resumes deliberations. Time: 1:30 PM."

Additionally, it does not appear that the 48 rounds of alleged ammunition were admitted as an exhibit at trial.

## DISCUSSION

**I.    There was Substantial Evidence that Exhibit 12A was a "Firearm"**

Defendant claims there was insufficient evidence that Exhibit 12A was a "firearm" under 29800, subdivision (a)(2). Not so.

On substantial evidence review, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

A firearm is "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion."

6.

(§ 16520, subd. (a).)  This provision essentially describes what everyone understands to be a "gun."

We conclude there was sufficient evidence that defendant possessed a shotgun on the day in question, and that the shotgun met the definition of a firearm.[2]

Alexander testified that Exhibit 12A was a "shotgun" that he had purchased.  The word shotgun is most commonly – if not exclusively – used to refer to a class of devices that fall under the definition of section 16520.  That is, "shotguns" *are* a specific type of device designed to be used as a weapon from which is expelled a projective through a barrel by the force of combustion.  Consequently, the fact that the purchaser of Exhibit 12A described it as a "shotgun" supports a reasonable inference the item was represented to him as a shotgun when he purchased it, which in turn supports a reasonable inference the item was indeed a "shotgun" – with all that name entails.

Moreover, Alexander testified that he was hesitant to discuss the shotgun with others because he had a prior conviction and was not supposed to have a firearm.  The evidence that the purchaser of the item in question considered it to be a "firearm" as that term is used in the laws prohibiting possession by convicts, and acted in accordance that belief, further supports the inference the shotgun was indeed a firearm.

Additionally, Officer Clapper testified that he examined Exhibit 12A and that it was a shotgun.[3]  Clapper pulled the trigger and heard a click indicating the internal hammer dropped.  Clapper concluded that if there had been a live round in the gun, it would have "gone off."[4]

---

[2] The cases cited by the parties are largely unhelpful as they do not involve a persuasive analogue to Alexander's testimony here.

[3] Defendant says there was insufficient foundation laid regarding Officer Clapper's familiarity with firearms.  But the fact that Clapper was a sworn peace officer working in a municipal police department is sufficient foundation for Clapper to offer simple observations about a firearm.

[4] Defendant argues there was no testimony that "going off" means "expel or discharge a projectile by the force of an explosion or other form of combustion."  But that is the most reasonable inference for the meaning of the phrase "going off" when used in

Taken together, this was all plenty of evidence to conclude Exhibit 12A met the relatively straightforward definition of a firearm.

Defendant points to other considerations that are arguably more favorable to his position, such as the fact that Exhibit 12A was not available to the jury during deliberations, Officer Clapper did not test fire the gun nor examine the internal functions of the gun, and Clapper did not provide additional supportive testimony. These contentions are immaterial on substantial evidence review. Because we concluded above that there is substantial evidence in support of the judgment, reversal is not warranted even though there is other evidence that could be reconciled with a contrary conclusion.

## II.    There was Substantial Evidence Defendant Possessed "Ammunition"

As it is used in section 30305, " 'ammunition' includes, but is not limited to, any bullet, cartridge, magazine, clip, speed loader, autoloader, ammunition feeding device, or projectile capable of being fired from a firearm with a deadly consequence. " 'Ammunition' does not include blanks." (§ 16150, subd. (b).)

Defendant contends there was insufficient evidence the 48 items found in the room were "ammunition." Not so. Officer Clapper directly testified that they were ammunition. He further explained that 47 of the rounds were .357 Magnum rounds and one round was a nine-millimeter Luger round. When asked what a .357 Magnum round was, Clapper testified that it was a cartridge "that could be fired out of a .357 caliber handgun."

Thus, contrary to defendant's claim, there was evidence the alleged ammunition was capable of being fired by a firearm: Officer Clapper's testimony.

Defendant cites several cases where an appellate court found the evidence sufficient and observes that some of the evidence presented in those cases is not present here. (See *In re Brandon G.* (2008) 160 Cal.App.4th 1076, 1079; *In re Khamphouy S.*

---

reference to a shotgun. Because it is a reasonable inference that supports the judgment, we indulge it.

8.

(1993) 12 Cal.App.4th 1130, 1133.) We find that reasoning unpersuasive. An appellate court's holding that the evidence in a particular case was sufficient to support the judgment is not equivalent to a holding that such evidence is *necessary* to support a judgment. Officer Clapper's testimony was substantial evidence the items found in the bedroom were "ammunition." The fact that some other cases have had more evidence on the issue is immaterial.

*In re Arcenio V.* (2006) 141 Cal.App.4th 613, on which defendant relies, is inapposite because in that case there was no direct testimony that the rounds were capable of being fired. (*Id.* at p. 616.) Here, however, Officer Clapper testified that 47 of the rounds were ".357 Magnum rounds" – meaning cartridges "that could be fired out of a .357 caliber handgun."[5]

## III. Defendant Has Not Established Sentencing Error

Defendant contends the court erred in sentencing defendant as it did.

### A. *Background*

Defendant suffered three convictions for first degree residential burglary from 1990 to 1993. Defendant also had prior convictions for various drug offenses, the most recent of which was in 2005. Defense counsel represented to the court that the 2005 conviction had recently been reduced to a misdemeanor under Proposition 47.

At the May 14, 2018, sentencing hearing, the court said that it had indicated to defense counsel it was willing to consider granting a *Romero*[6] motion if defendant participated in a drug treatment program. The court was also "open to" the alternative

---

[5] Even assuming, arguendo, there were insufficient foundation regarding Officer Clapper's familiarity with ammunition, it would not impact our substantial evidence analysis. Incompetent testimony, if admitted without objection, takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding. (*People v. Bailey* (1991) 1 Cal.App.4th 459, 463.) In conducting substantial evidence review, we must give such testimony the same weight as if it were competent evidence. (*Ibid.*)

[6] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

idea of giving defendant the mitigated term and doubling it pursuant to the strikes. Defendant said he would like to participate in the drug program. The court responded that defendant would "have to actually participate and complete a program." Defendant responded, "Yes, sir" and mentioned that he had previously participated in a program.

The court said, "I just want to make sure you understand this." "If you screw up, I'm not bound to the 16 months double. You can get six years." The court asked if defendant understood, and he responded affirmatively. The court reiterated that it was giving defendant an opportunity to "show yourself, see how you can do."

On June 14, 2018, the defendant wrote a letter to the judge saying he had learned the importance of living an honorable life and was making changes in his life. He said the changes would "ensure this honorable court that I can be trusted to be a blessing to the public" and his family. Defendant asked for forgiveness and mercy for the violation of trust represented in the charges filed against him. Defendant concluded the letter by saying he would respect the judge's decision in the matter.

On June 19, 2018, defendant filed an invitation for the court to strike his prior strike convictions under *Romero*, *supra*, 13 Cal.4th 497. He argued that his strikes were remote in time, having occurred more than 25 years ago. He further contended that burglaries involved entry into attached garage and not living quarters. He said that he was struggling with drug addiction at the time. Defendant conceded that he has had some relapses over the years. He contended that his "criminality has significantly decreased since the time of his strike convictions" with the "only subsequent convictions [being] for simple drug possession offenses."

Finally, defendant said he is a long term member of a church where he attends services and volunteers; he also volunteers at a local community center, and he is self-employed as a handyman and performing construction work.

At a continued sentencing hearing on August 9, 2018, the court and defendant confirmed that he would be doing a program with Salvation Army. The court told

defendant that for them to proceed with the drug program, he would need to agree to two conditions. First, he would be subject to search. Second, "if you leave the program for any reason, on the day that you leave or get kicked out you[] need to call your attorney and the very next day, assuming it's a weekday, you need to be here at our courtroom, and we'll figure out where we are going to go from there, okay? [¶] So if for some reason you leave or get kicked out on a Saturday then you call your attorney and then be here on the Monday, okay?" Defendant replied, "Okay."

Defendant was released to the Salvation Army on August 10, 2018, but only remained there until August 17, 2018. Defendant failed to appear at a sentencing review hearing on November 8, 2018, and a bench warrant was issued. Defendant was arrested more than two years later, on March 15, 2021.

A hearing was held on April 15, 2021. Defense counsel argued that defendant had not committed any new offenses in the years that he had been "out of touch with us." Defense counsel also asserted defendant had deteriorated physically in the intervening years. The prosecutor countered that his failure to return to court after skipping out on the Salvation Army program was a continuing violation over the years he was gone. The court agreed that defendant had been violating the court's indicated sentence "every single day" over the three years he was gone. The court sentenced defendant on count 1 to the middle term of two years, doubled pursuant to section 667, subdivision (e)(2)(C) for a total term of four years. The court imposed a concurrent sentence on count 2 of the middle term (two years) doubled to four years.

**B.**    *Analysis*

Defendant says the court abused its discretion by sentencing him to the middle term and doubling it pursuant to the "Three Strikes" law. Specifically, he contends his history, personal circumstances, the nature of the current offense and his age establish that he falls outside the spirit of the Three Strikes law. We disagree.

11.

### 1.    Law

The purpose of the Three Strikes law is to "ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of one or more serious or violent felony offenses."  (§ 667, subd. (b).)

"[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, 'in furtherance of justice' pursuant to … section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

The trial court's ruling may only be reversed if it was an abuse of discretion – meaning that it " 'falls outside the bounds of reason.' "  (*People v. Williams*, *supra*, 17 Cal.4th at p. 162.)

### 2.    Application

Defendant has a substantial criminal record.  He has been convicted of three first degree residential burglaries and several drug related offenses.  To that substantial history he has now added convictions for possessing a firearm and possessing ammunition as a felon.

Moreover, defendant's "prospects" are limited.  By defendant's own admission, much of his prior criminality was tied to drug abuse.  Yet, he failed to last more than a week in a program designed to combat that problem.  As the Attorney General observes, "[T]he trial court could reasonably conclude that [defendant's] prospects were poor."

Given these considerations, we cannot say the trial court's ruling falls outside the bounds of reason.

Defendant counters that it creates a "perverse incentive" to sentence him to a harsher sentence than offered to him before he participated in the program. Not so. To the contrary, the court was trying to incentivize defendant to complete the program by saying, "[i]f you screw up, I'm not bound to the 16 months double. You can get six years." There is nothing perverse about the court's approach of incentivizing defendant to complete the program.

It is true that there are some other considerations in defendant's favor – such as the strikes being remote in time, defendant asserting he was involved in the community, and (arguably) his age. But in light of all the considerations supporting the sentencing court's decision, we cannot say that the presence of some considerations on other side render that decision arbitrary or reversible.

## IV.    Defendant Forfeited his Ability-to-Pay Claim

Defendant contends the court's imposition of fines and fees violated his right to due process under the California and federal constitutions. We conclude the claim is forfeited.

On January 8, 2019, the Second District Court of Appeal decided *People v. Dueñas* (2019) 30 Cal.App.5th 1157, wherein they held that the imposition of fines and fees against defendants who lack the present ability to pay violates the due process clauses of the federal and state constitutions.[7]

More than two years later, on April 15, 2021, the court in the present case imposed various fines and fees against defendant. Defendant now challenges those fines and fees on due process grounds.

The Attorney General argues that by failing to raise this claim in the trial court, defendant forfeited it. We agree, because "[i]n general, a defendant who fails to object to

---

[7] The Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844 to resolve a split among the Courts of Appeal on this issue.

the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge those fines, fees, and assessments on appeal."**[8]** (*People v. Greeley* (2021) 70 Cal.App.5th 609, 624.) We decline defendant's invitation to exercise our discretion to excuse the forfeiture.

## V.     Defendant has not Established Ineffective Assistance of Counsel

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Consequently, an appellate court will not find ineffective assistance of counsel on direct appeal if there is even a *conceivable* reason for counsel's omissions. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.)

At sentencing, the court reduced a $1,200 fine to $300 fine under section 1202.4 "in light of the Defendant's age." The court also suspended a fine of $300 under section

---

**[8]** Defendant seeks judicial notice of the People's "Answering Brief on the Merits" filed in the Supreme Court regarding the case *People v. Kopp*, *supra*, S257844. He cites the brief to establish that the People have conceded trial courts must consider a defendant's ability to pay when setting fines and fees. Because the Attorney General does not oppose the request, we grant it. However, we do not reach the issue for which it is cited because we conclude the claim was forfeited for failure to object below.

1202.45 and declined to impose a $296 probation report fee "due to the Defendant's age and period of incarceration."

Defendant characterizes the court's declining to impose the probation report fee due to his age and period of incarceration as a finding he was unable to pay the fines/fees. We find that interpretation debatable, at best. In any event, the fact that the court reduced, suspended, or eliminated some fines/fees, while simultaneously imposing other fines/fees, does not imply a global finding that defendant was unable to pay *any* fines/fees, but rather a finding that defendant could only afford *some* fines/fees. It remains a "conceivable" possibility that counsel knew defendant could afford the reduced fees actually imposed and therefore declined to object on ability-to-pay grounds. While defendant might be able to disprove this possibility on habeas, its conceivability precludes a finding of ineffective assistance on direct appeal.

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


HILL, P. J.


DETJEN, J.


15.